FILED

Apr 05 2016, 9:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT
Victoria L. Bailey
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 49S00-1409-CR-770

MICHAEL ACKERMAN,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Marion Superior Court, No. 49G04-1304-MR-26772
The Honorable Lisa Borges, Judge

On Direct Appeal from a Sentence of Life Imprisonment With the Possibility of Parole

**April 5, 2016**

**David, Justice.**

This case raises an issue of first impression in Indiana and has divided both state and federal jurisdictions. Under the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The primary question is whether the admission of an autopsy report into evidence violates

the defendant's constitutional rights under the Confrontation Clause, where it has been demonstrated that the pathologist who performed the autopsy is unavailable to testify at trial, and the defendant had no prior opportunity for cross-examination. After examining U.S. Supreme Court precedent, precedent from other jurisdictions, relevant state statutes, secondary sources, and the circumstances of the present case, we now conclude that the autopsy report in the present case was not testimonial. Thus, Ackerman's confrontation right was not violated when the report was admitted into evidence, nor did a violation arise when a surrogate pathologist testified regarding the information detailed in the autopsy report.

In addition, although Ackerman's prosecution for the murder of a toddler occurred many years after the child's death, the delay did not actually or substantially prejudice Ackerman, nor could Ackerman demonstrate that the State intentionally delayed prosecution. Thus, we also hold that the delay, under the circumstances of this case, did not result in a due process violation. Finally, we hold that even if the trial court erred at sentencing by taking into consideration sentencing statutes that were inapplicable in this case, the error was harmless.

Ackerman's conviction and sentence are affirmed.

**Facts and Procedural History**

In 1977, D.S. was in a relationship with Michael Ackerman. D.S. was living in an apartment with her two children, three-year-old I.W., and twenty-one-month-old W.W. On the morning of January 17, 1977, D.S. was leaving early to go to work, but she first checked on W.W., who was lying in his crib and stood up when D.S. entered the room. D.S. noticed nothing wrong with W.W. at that time. That day, Ackerman had agreed to watch the children while D.S. went to work, and when she left the apartment, Ackerman was alone with I.W. and W.W.

At some point during the morning, D.S. received a panicked call from Ackerman that W.W. was not breathing. Ackerman told D.S. that he had "beat" on W.W.'s stomach to resuscitate him.

2

(Tr. at 159.) D.S. told Ackerman to stop and call the police, and she immediately left work to go home.

When D.S. arrived at the apartment, Ackerman walked up to D.S. and handed her W.W.'s lifeless body. W.W. was limp and his eyes were rolled back in his head. D.S. still attempted to revive W.W. and was screaming frantically for the neighbor to help. The neighbor called for an ambulance and attempted CPR, with no result. When the ambulance arrived, the EKG showed no signs of life, and no further attempts to revive W.W. were made.

On the same day, an autopsy was conducted by Dr. John Eisele. The autopsy report revealed multiple injuries to W.W.'s head, neck, abdomen, extremities, and internally. The autopsy report listed thirty-five separate injuries. Dr. Eisele concluded that the cause of W.W.'s death was multiple injuries and that the manner of death was homicide. However, the Coroner's verdict listed the manner of death as "undetermined." (Exhib. Tr. at 69.) Although Ackerman was questioned by police, no criminal charges were filed.

Thirty-six years after W.W.'s death, I.W. contacted the Indianapolis Metropolitan Police Department Cold Case Unit, where she left a message and eventually spoke directly to Detective David Ellison. She reported to Detective Ellison that she remembered the day her brother died. I.W. recalled Ackerman telling her that he was going to give W.W. a bath, but shortly after that she heard W.W. screaming. I.W. walked to the bathroom door and saw Ackerman shaking W.W. and remembered W.W. struggling and his face turning purple.

Detective Ellison began an investigation. He discovered that several of the officers who responded to the call of W.W.'s death; Dr. Eisele, who performed the autopsy; and two police officers, who had been present during the autopsy, were all now deceased. However, I.W.'s statement directly implicating Ackerman, the recollection of an ambulance driver who arrived on the scene and recalled the injuries to W.W. as being fresh, the autopsy report that concluded the manner of death was homicide, and the individual assessment of the autopsy from two certified

pathologist, who also concluded that the manner of death was homicide, culminated in Ackerman's arrest on April 24, 2013, and charge of second degree murder.[1]

On May 20, 2014, Ackerman signed a verified waiver of his right to a trial by jury, and the case proceeded to a bench trial. Ackerman also filed a motion to dismiss asserting that the delayed prosecution between W.W.'s death in 1977 and when he was charged in 2013 resulted in the loss of physical and testimonial evidence that was material to his defense, and as such, substantially prejudiced him, violating his Fifth Amendment right to due process. The trial court denied the motion to dismiss, finding no deliberate delay on the part of the State or substantial prejudice to Ackerman.

During the course of the bench trial, the State introduced into evidence the Coroner's file, which included the autopsy report. Ackerman objected to the admission of the autopsy report, asserting that it constituted a Confrontation Clause violation because the report was testimonial, Dr. Eisele was unavailable as a witness, and Ackerman had no prior opportunity to cross-examine Dr. Eisele. However, the trial court overruled Ackerman's objection and allowed the Coroner's file to be admitted into evidence.

In addition to the autopsy report, the State called Dr. Dean Hawley, a forensic pathologist, to testify regarding his independent opinion of W.W.'s death and injuries based upon the autopsy report. Dr. Hawley was the pathologist for Marion County during the time W.W. had died, but was not present during W.W.'s autopsy. Dr. Hawley testified in part to the type of injuries W.W. incurred and gave his own medical opinion that the cause of death was from "blunt force injuries

---

[1] Ind. Code § 35-1-54-1 (1976).

of the head, chest, and abdomen" and "within reasonable medical certainty, the manner of death for [W.W.] [was] homicide." (Tr. at 261.) No objections were made to Dr. Hawley's testimony.

Ackerman continued to assert that he had not caused the fatal injuries to W.W. or, alternatively, that the injuries leading to W.W.'s death were accidental. The trial court ultimately found Ackerman guilty of second degree murder, and he was sentenced under the relevant sentencing statutes in 1977 to life in prison with the possibility of parole.

Ackerman appealed, asserting three claims: (1) violation of his Sixth and Fourteenth Amendment rights under the Confrontation Clause by the admission of the autopsy report and Dr. Hawley's testimony regarding Dr. Eisele's findings and conclusions from the report; (2) violation of his Fifth Amendment Due Process Clause right based upon the thirty-six-year delay in prosecution; and (3) abuse of the trial court's sentencing discretion when the court considered the current sentencing statutes for murder when his sentence was imposed.

Ackerman then filed a verified motion for the Court of Appeals to determine, pursuant to Indiana Appellate Rule 6, that the Indiana Supreme Court had jurisdiction over the case and to stay briefing pending resolution of the jurisdictional issue. The Court of Appeals ordered that the appeal be transferred to this Court under Indiana Appellate Rule 6,[2] and this Court accepted jurisdiction. Upon review, we now hold that neither the admission of the autopsy report nor Dr. Hawley's testimony regarding the report violated Ackerman's constitutional confrontation right. We also hold that Ackerman failed to demonstrate that his right to due process was violated based

---

[2] Although Ackerman's appeal does not fall under this Court's mandatory and exclusive jurisdiction, as set out in Indiana Appellate Rule 4, the State did not oppose the motion to transfer to this Court and had no objection to the exercise of original jurisdiction by this Court. This Court may "elect to accept jurisdiction outside the regular process" set out in the appellate rules. Tyson v. State, 593 N.E.2d 175, 181 (Ind. 1992).

upon the delayed prosecution in this case. Finally, we find that any error that occurred at sentencing was harmless. Ackerman's conviction and sentence are affirmed.

**Standard of Review**

When ruling on the admissibility of evidence, the trial court has broad discretion, which a reviewing court will disturb only where it is shown that the court abused that discretion. Speers v. State, 999 N.E.2d 850, 852 (Ind. 2013) (citing Turner v. State, 953 N.E.2d 1039, 1045 (Ind. 2011)). However, when a constitutional violation is alleged, "the proper standard of appellate review is de novo." Id.

In reviewing a motion to dismiss, "[a] defendant has the burden of proving, by a preponderance of the evidence, all facts necessary to support a motion to dismiss." Barnett v. State, 867 N.E.2d 184, 186 (Ind. Ct. App. 2007). Where the defendant is appealing from a negative judgment, "we will reverse only if the evidence is without conflict and leads inescapably to the conclusion that [the defendant] is entitled to a dismissal." Id.

Finally, sentencing is left to the discretion of the trial court, and we review sentencing only for an abuse of that discretion. Anglemyer v. State, 868 N.E.2d 482, 490-91 (Ind. 2007), *reh'g granted on other grounds*.

**Discussion**

Three primary issues are raised by Ackerman. Ackerman asserts that the admission of an autopsy report that was prepared by Dr. Eisele, who is now deceased, and whom Ackerman had no prior opportunity to cross-examine, violated his rights under the Confrontation Clause of the United States Constitution. U.S. CONST., Amend. VI. Furthermore, Ackerman asserts that it was

fundamental error[3] for Dr. Hawley to testify regarding the autopsy report and to recite Dr. Eisele's conclusions from that report.

Next, Ackerman argues that the delay between W.W.'s death and the murder charges brought against him violated his due process rights, and the trial court erred in denying his motion to dismiss on those grounds. Ackerman argues he showed both substantial prejudice from the delay and that the State had no justification for the delay.

Finally, Ackerman argues that even if he was not entitled to have his case dismissed, the trial court erred during sentencing. During sentencing, the trial court made reference to the current sentencing scheme for murder. Ackerman claims that only the relevant sentencing statutes in effect in 1977 were controlling, and the trial court erred in allowing present sentencing statutes to influence the sentencing decision.

We address each of Ackerman's claims in turn. Ultimately, we affirm the trial court and uphold Ackerman's conviction and sentence.

## I.    Confrontation Clause

Under the Sixth Amendment of the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST., Amend. VI. The U.S. Supreme Court provided that this prohibits the

---

[3] It is undisputed that Ackerman only made an objection to the admission of the autopsy report itself and did not object to Dr. Hawley's testimony at trial. As such, to prevail on this portion of Ackerman's confrontation argument, Ackerman must also demonstrate that the introduction of the testimony was fundamental error.

"admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004). While the court left "testimonial" undefined, the court did identify the "core class of 'testimonial statements'" that the Confrontation Clause is primarily concerned with: (1) "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52.

Since Crawford, the U.S. Supreme Court has expanded upon when a statement should be deemed testimonial. In Davis v. Washington, the U.S. Supreme Court explained that statements are testimonial when the "circumstances objectively indicate" that they are being made for the "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." 547 U.S. 813, 822 (2006). "An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the 'primary purpose'" of the statement. Michigan v. Bryant, 562 U.S. 344, 360 (2011). Thus, for those statements that do not clearly fall within the core class of testimonial statements as set out in Crawford, the primary purpose test has been the predominate analysis that occurs when determining whether a statement is in fact testimonial in nature.

The U.S. Supreme Court has not addressed whether an autopsy report is testimonial in nature, but two cases have discussed the testimonial nature of forensic lab reports. Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009); Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011). Other State jurisdictions have looked to both Melendez-Diaz and Bullcoming as guidance in assessing whether autopsy reports should similarly be treated as testimonial statements.

8

In Melendez-Diaz, the U.S. Supreme Court addressed a confrontation challenge raised upon the admission of "certificates of analysis," which showed the results of a forensic test confirming that the substance seized from the defendant was cocaine. 557 U.S. at 308. The certificates were sworn before a notary public by the analysts who conducted the forensic testing, but the analysts did not testify at trial. Id. at 308-09. The court determined that the certificates of analysis fell clearly within the category of testimonial statements, as they were "quite plainly affidavits: 'declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths.'" Id. at 310 (quoting Black's Law Dictionary 62 (8th ed. 2004)). Next, the court concluded that the purpose of the certificates under state law was specifically to provide evidence of a substance's composition, quality, and net weight, allowing the court to "safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose—as stated in the relevant state-law provision—was reprinted on the affidavits themselves." Id. at 311. Thus, the court considered that the certificates were akin to formal affidavits that fall within a traditional type of testimonial statement, and the circumstances when the testing was performed also supported the conclusion that the analyst should have been aware that the primary purpose of the forensic test would be to aid in a future criminal investigation or prosecution.

In Bullcoming v. New Mexico, a forensic lab report certifying the petitioner's blood-alcohol concentration was admitted, showing that his concentration level was high enough to establish an aggravated driving offense. 131 S. Ct. at 2709. The forensic analyst did not testify at trial and was never shown to be unavailable. Id. at 2709, 2714. The court addressed whether the report could be admitted through the testimony of another analyst who did not sign the report certification, conduct the test, or observe the testing. Id. at 2710. The analyst who performed the testing had certified that the sample was opened in the laboratory, that the report was accurate, and that certain procedures set out on the report had been followed. Id. In accordance with Melendez-Diaz, the court concluded that "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution . . . is 'testimonial,' and therefore within the compass of the Confrontation Clause." Id. at 2713-14. The court asserted that a confrontation violation could still

9

arise, even if the analyst who performed the test merely transcribed results provided by a machine. Id. at 2714. The surrogate analyst could not be cross-examined on the test used, the process followed, any misinformation in the report, or explain why the analyst who had performed the test was now on unpaid leave. Id. at 2715. The court also reiterated that the forensic report itself was testimonial. Id. at 2716-21. Even though the report was unsworn, in all other respects it resembled the reports from Melendez-Diaz: law-enforcement provided the sample to be tested at a laboratory required by law to assist in police investigations, the analyst conducted the test and certified the results of the analysis, the forensic report was "formalized" in a signed document, and the legend in the report referenced local court rules that allowed for the admission of these reports in court. Id. at 2716-17. Again, the formality of the document was considered, along with the primary purpose of the document in light of the circumstances.

Thus, while the U.S. Supreme Court has held twice that certificates of analysis showing the results of forensic testing and created in aid of police investigations were testimonial, the court has yet to clearly determine whether an autopsy report, that explains the manner and cause of death, is also testimonial. Most recently, the U.S. Supreme Court handed down Williams v. Illinois, 132 S. Ct. 2221, 2229-33 (2012), which addressed the testimonial nature of yet another type of laboratory report, a DNA profile of a suspect in a rape case. A plurality of the court found that the lab report was not testimonial. Id. at 2244. Justice Alito's opinion held that no confrontation violation arose because the report was not admitted for the truth of the matter asserted and therefore was not hearsay. Id. at 2227-28. However, even if hearsay, the report would not be testimonial because the primary purpose of the report was not to serve as evidence against a specified individual. Id. Alternatively, Justice Thomas' concurrence relied solely upon the solemnity test, concluding that the report lacked the "solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact." Id. at 2260.

Typically, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .'" Nichols

v. U.S., 511 U.S. 738, 745 (1994) (quoting Marks v. U.S., 430 U.S. 188, 193 (1977)).  However, in some cases "there is no lowest common denominator or 'narrowest grounds' that represents the Court's holding," and thus it is not useful to engage in this inquiry.  Nichols, 511 U.S. at 745.  Because Williams presents such a situation where there is no "narrowest ground" between Justice Alito's and Justice Thomas' opinions, we do not find Williams to be controlling.  Thus, our analysis looks to the aforementioned precedent in determining whether an autopsy report is testimonial hearsay.  We also consider the opinions and law of other jurisdictions as helpful to our analysis.  Allen v. Van Buren Twp. Of Madison County, 243 Ind. 665, 671, 184 N.E.2d 25, 28 (Ind. 1962) ("While well-reasoned opinions from other jurisdictions may be persuasive in the determination of a new question of law they are, however, not conclusive.").

Due to the lack of clear guidance on this issue, states are split over whether an autopsy report is testimonial hearsay.  The New Mexico Supreme Court has addressed whether an autopsy report is testimonial, and also whether a surrogate pathologist or medical examiner could testify about the facts and conclusions of a report that the testifying pathologist was not present for nor created.  See State v. Navarette, 294 P.3d 435, 438 (N.M. 2013).  "Since *Crawford*, a majority of the United States Supreme Court has mainly focused on the primary purpose for which the statement was made," in assessing whether a statement is testimonial.  Id.  In applying this standard, the court in State v. Jaramillo, 272 P.3d 682 (N.M. 2011), found an autopsy report to be testimonial, because the autopsy report was critical to the prosecution and was "prepared with the purpose of preserving evidence for criminal litigation."  Id. at 682.  The autopsy was performed as "part of a homicide investigation" with two police officers attending the autopsy.  Navarette, 294 P.3d at 440.  In addition, because state statute required medical examiners to report his or her findings to the district attorney, he or she "should know that her statements may be used in future criminal litigation."  Id. at 440-41.

The Navarette court then took the analysis from Jaramillo one step further to address whether a surrogate pathologist could testify about the contents of an autopsy report.  Even though the autopsy report itself was not admitted into evidence, a pathologist who did not perform or

11

observe the autopsy could not testify about the findings and conclusions of that report without also violating the defendant's confrontation right. Id. at 443. However, the court clarified that it is "not to say that all material contained within an autopsy file is testimonial . . . . [w]ithout attempting to catalogue all material in a file that could be admissible, we note that an expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause." Id.

In applying the primary purpose test, the Supreme Court of West Virginia also concluded that autopsy reports can be testimonial in nature. State v. Frazier, 735 S.E.2d 727, 731 (W.Va. 2012). An autopsy was conducted on a woman who had been shot, and the medical examiner who performed the autopsy discussed the circumstances of the victim's death with police. Id. at 729. The medical examiner noted in the autopsy report what he had learned from police about the shooting, including that the suspected perpetrator had been arrested and had confessed to the shooting. Id. The court also considered state statutes, which required autopsy reports to be kept and indexed, allowed prosecuting attorneys or law-enforcement to secure copies of the records "for the performance of his or her official duties," required that reports be furnished to "any court of law, or to the parties therein to whom the cause of death is a material issue," and also required that autopsy reports be admitted into evidence. Id. at 731. The court concluded that "[i]t is clear that . . . an autopsy report prepared in a homicide case has the primary purpose of establishing or proving past events (facts) potentially relevant to a later criminal prosecution, and is therefore a testimonial statement." Id. at 732. Moreover, because the medical examiner, who had not performed nor observed the autopsy, failed to testify about his own opinions, but rather repeated the key findings from the autopsy report, the court concluded that the error was not harmless. Id. at 733-34. See also Com. v. Avila, 912 N.E.2d 1014, 1029 (Mass. 2009) (holding expert testimony by a medical examiner who did not conduct the autopsy and who recited the findings within the autopsy report was inadmissible hearsay and also violated the confrontation clause); Cuesta-Rodriguez v. State, 241 P.3d 214, 228 (Okla. Crim. App. 2010) (holding that the circumstances surrounding the death "warranted the suspicion" that the death was a homicide, and because of

that it was "reasonable to assume" that the medical examiner performing the autopsy was aware that his findings and opinions would be used in a criminal prosecution).

Alternatively, several jurisdictions have found autopsy reports to be non-testimonial. The Illinois Supreme Court engaged in a four-part analysis to determine whether the admission of an autopsy report in a homicide case violated the confrontation clause. People v. Leach, 980 N.E.2d 570, 581 (Ill. 2012). The court considered: (1) whether the statement was offered for the truth of the matter asserted (hearsay); (2) If hearsay, was there an applicable hearsay exception; (3) If admissible hearsay, was the statement testimonial; and (4) If testimonial, was the admission of the statement harmless error? Id. The court determined that the autopsy report was admitted for the truth of the matter asserted, but the business records hearsay exception and the public records exception both applied. Id. at 581-82. The court then assessed the testimonial nature of the autopsy report. Id. at 582. Although Crawford provided that business records would rarely implicate the confrontation clause, the Leach court acknowledged that even business records could be testimonial. Id. at 583.

After examining relevant U.S. Supreme Court precedent, the Leach court concluded that "whichever definition of primary purpose is applied, the autopsy report in the present case was not testimonial because it was (1) not prepared for the primary purpose of accusing a targeted individual[4] or (2) for the primary purpose of providing evidence in a criminal case." Id. at 590. "[A]lthough the police discovered the body and arranged for transport" the police did not request the autopsy, but rather "[t]he medical examiner's officer performed the autopsy pursuant to state

---

[4] The Williams plurality provides that this is the proper standard for assessing the primary purpose of a statement. Williams, 132 S. Ct. at 2242. The court explained that cases giving rise to confrontation violations have two common characteristics: "(a) they involved out-of-court statements having the primary purpose of *accusing a targeted individual of engaging in criminal conduct* and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." Id. (emphasis added).

law, just as it would have if the police had arranged to transport the body of an accident victim" Id. at 591. Therefore, the medical examiner "was not acting as an agent of law enforcement, but as one charged with protecting the public health by determining the cause of a sudden death that might have been 'suicidal, homicidal or accidental.'" Id. at 591-92 (citing 55 ILCS 5/3-3013 (West 2010)). Even though autopsy reports can be used in civil or criminal cases, "these reports are not usually prepared for the sole purpose of litigation." Id. at 592. Additionally, the court distinguished the autopsy report from the certificates of analysis in Melendez-Diaz by explaining that the autopsy report was not "certified or sworn" but "was merely signed by the doctor who performed the autopsy." Id. However, as in prior cases, the Leach court did not intend to make a blanket rule for all autopsy reports. Instead, the court provided that autopsy reports may be testimonial "in the unusual case in which the police play a direct role . . . and the purpose of the autopsy is clearly to provide evidence for use in a prosecution." Id.

The Arizona Supreme Court has also found autopsy reports to be non-testimonial. State v. Medina, 306 P.3d 48 (Ariz. 2013). The court looked to Williams and concluded that "[n]either the plurality's 'primary purpose' test nor Justice Thomas's solemnity standard can be deemed a subset of the other; therefore, there is no binding rule for determining when reports are testimonial." Id. at 63. As such, the court applied both standards and held that the autopsy report was neither created for the primary purpose of accusing a specified individual, nor did the report satisfy the solemnity test because it did not certify the truth of the analyst's representations or arise from "a formal dialogue akin to custodial interrogation." Id. at 63-64. Accordingly, the court also held that the surrogate medical examiner could testify about the contents of the autopsy report without violating the defendant's confrontation rights. Id. at 64. See also United States v. James, 712 F.3d 79, 97-99 (2nd Cir. 2013) (objective circumstances and examination of state statutes lead to conclusion that autopsy report "was not prepared primarily to create a record for use at a criminal trial"); State v. Maxwell, 9 N.E.3d 930, 944-52 (Ohio 2014) (autopsy reports are not to serve as substitutes for trial testimony, but rather serve the purpose of documenting cause of death for public records and public health); People v. Dungo, 286 P.3d 442, 449-50 (Cal. 2012) (autopsy reports lack formality

14

or solemnity and are prepared for a variety of purposes, not just for the purpose of criminal investigation or prosecution).

While these cases exemplify the differing conclusions reached on this issue, they do not necessarily demonstrate a stark division between the States. It does not appear that any jurisdiction has adopted a bright-line rule establishing that autopsy reports will always be testimonial or non-testimonial. Rather, each state considers relevant state statutes and the circumstances of that particular case in applying its understanding of the primary purpose test. In each instance, the circumstances under which the autopsy is performed and relevant state statutes strongly influence the analysis. The New Mexico Supreme Court, which has found autopsy reports to be testimonial, still acknowledged that it is "not to say that all material contained within an autopsy file is testimonial . . . ." Navarette, 294 P.3d at 443, and the Illinois Supreme Court, which has found autopsy reports to be non-testimonial, conceded that autopsy reports may be testimonial "in the unusual case in which the police play a direct role . . . and the purpose of the autopsy is clearly to provide evidence for use in a prosecution." Leach, 980 N.E.2d at 592. In other words, although jurisdictions appear to be split, a split may or may not exist in every case.

For example, the circumstances presented in Frazier, decided by the West Virginia Supreme Court, may have caused the Illinois Supreme Court to agree that the autopsy report under the facts of Frazier was testimonial. In Frazier, the medical examiner spoke to police about the circumstances surrounding the victim's death. In a summary within the autopsy report, the medical examiner noted what he had discussed with police, providing that the victim had been fighting with her boyfriend, walked into the bedroom and grabbed a gun, and the boyfriend then grabbed the gun from her and shot her. Frazier, 735 S.E.2d at 729. Even more significant, the medical examiner was aware that the boyfriend had been arrested and confessed to the shooting. Id. Thus, these circumstances would possibly support the Illinois Supreme Court in concluding that the police were directly involved, and the medical examiner was aware that the autopsy report would be aiding in a criminal investigation and prosecution. The facts of Frazier could present the rare circumstances that the Illinois Supreme Court hypothesized may result in finding an autopsy report

to be testimonial. Thus, the differing conclusions reached by the states are informative by demonstrating that a bright-line rule for the testimonial nature of an autopsy report may not be appropriate or even workable.

Similarly, the U.S. Supreme Court's analyses in Melendez-Diaz and Bullcoming also emphasize that the *circumstances* under which the certificates of analysis were developed supported the conclusion that the reports had been created for the purpose of aiding a police investigation. Because this case presents an issue of first impression in Indiana, we conduct our analysis in accordance with U.S. Supreme Court precedent and are mindful of other jurisdictions in assessing whether Ackerman's constitutional confrontation rights were violated.

In the present case, Ackerman argues that the admission of the autopsy report and the testimony from the pathologist who had not performed the autopsy were both violations of his confrontation rights. We will assess Ackerman's claim by considering whether the autopsy report was hearsay; if hearsay, whether there is an applicable hearsay exception; and if there is an exception, whether the report is testimonial. If the report is testimonial, we must then assess Dr. Hawley's specific testimony to determine whether he recited any of the testimonial statements from the autopsy report, rather than asserting only his own opinions and conclusions. Alternatively, if the autopsy report presents no confrontation violation, Dr. Hawley's testimony would also not have resulted in a confrontation violation. Thus, we first consider the admission of the autopsy report alone.

Hearsay is a statement that is "not made by the declarant while testifying at the trial or hearing" and "is offered in evidence to prove the truth of the matter asserted." Ind. Evid. Rule 801(c). Here, the autopsy report obviously was not a statement made by the declarant at trial or at a hearing. In addition, it seems equally clear that it was admitted to prove the various injuries that W.W. suffered, the cause of his death, and the manner of his death. The parties do not seem to dispute that this was the purpose of the admission, and as such, we can quickly conclude that the autopsy report did contain hearsay.

16

Next, we consider whether a hearsay exception applies to the autopsy report. Here, the State sought to admit the autopsy report under what is commonly referred to as the business records exception.[5] This Court has previously found that an autopsy report is admissible as a business record. See Thompson v. State, 270 Ind. 442, 444, 386 N.E.2d 682, 684 (1979) (holding that where the autopsy report was kept as a record in the routine course of business and was placed into the record by someone with personal knowledge of the record at the time it was entered, the autopsy report qualified as a business record for purposes of the hearsay exception).

In the present case, the State called the Chief Deputy Coroner of Marion County to establish a foundation and admit the entire Coroner's file, which contained the autopsy report. (Tr. at 139.) Alfarena Ballew testified to her qualifications, knowledge, and that she had signed the "Affidavit of Custodian of Business Records" as the custodian of records for the Marion County Coroner's Office. (Exhib. Tr. at 66.) The affidavit was notarized and confirmed that Ballew was familiar with the record keeping practices and supervision of records; the record was that of W.W.'s autopsy; and the records and photos were made and kept in the course of regularly conducted business activity, near the date of the event recorded, were not prepared in anticipation of litigation, and were kept by employees of the business who had personal knowledge of the facts and events recorded. Furthermore, Ackerman agreed that the autopsy report fell within the business records exception, and only maintained his objection to the admission of the report on confrontation

---

[5] Under Indiana Evidence Rule 803(6) "Records of a Regularly Conducted Activity" may be admissible if: "(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness . . .; (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness."

grounds. We also conclude that the autopsy report is admissible hearsay under the exception for regularly conducted activity. Ind. Evid. Rule 803(6).

Since the autopsy report is hearsay, but will not be excluded because it falls with the exception for regularly conducted activity, we now must assess whether the report should be excluded based upon a confrontation violation. Dr. Eisele, who performed the original autopsy, was deceased at the time of Ackerman's trial and therefore unavailable. The parties also agree that Ackerman had no prior opportunity to cross-examine Dr. Eisele, and Ackerman objected to the admission of the report on confrontation grounds. Thus, if the autopsy report is found to be testimonial, the admission of the report was error. We note that there are several aspects to the autopsy report, including a written portion, typed portion, and diagrams, all of which were admitted into evidence as part of the Coroner's file. Photographs of W.W. were admitted separately and were not raised as part of the confrontation objection.

The autopsy report contains both conclusions about the cause and manner of death, along with documentation of the injuries W.W. suffered. The report details the numerous injuries W.W. suffered to his head, neck, trunk, extremities, and internally. Based upon these injuries, Dr. Eisele gave his opinion that the cause of W.W.'s death was "multiple injuries." (Tr. Exhib. at 29.) On a separate form, Dr. Eisele concluded that the "manner of death" was "homicide." (Tr. Exhib. at 11.) On the autopsy form, Dr. Eisele could have selected that the manner of death was natural, accident, suicide, homicide, or undetermined. The certificate from the Coroner also provided that the cause of death was multiple injuries, but the manner of death was "undetermined." (Tr. Exhib. at 8.)

The first step in assessing whether the autopsy report is testimonial is determining the primary purpose of the report. "An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the 'primary purpose'" of the statement. Bryant, 562 U.S. at 360. In making this objective assessment, we also

18

consider relevant Indiana Statutes and guidance provided to Indiana coroners, who are tasked with investigating deaths and ensuring that autopsies are conducted when necessary.

Under Indiana Code § 36-2-14-6, the Coroner is tasked with investigating any death when notified that the person: "(1) has died from violence; (2) has died by casualty; (3) has died when apparently in good health; (4) has died in an apparently suspicious, unusual, or unnatural manner; or (5) has been found dead." An autopsy may be conducted if the Coroner considers an autopsy necessary for the investigation, if required under another statutory section, or if the prosecuting authority requests that an autopsy report be conducted, at which time the Coroner is to employ a certified pathologist to perform the autopsy. Ind. Code § 36-2-14-6(d). The term "autopsy" has been defined as "the dissection of a dead body *for the purpose of ascertaining the cause, seat, and nature of a disease or for the purpose of inquiring into the cause of death*."[6] Ind. Code § 16-36-2-1 (emphasis added). Thus, although an autopsy could aid in the investigation or prosecution of a criminal case, our statutes alone do not suggest that assisting in a criminal case is the primary purpose of an autopsy.

Other resources relied upon by Indiana coroners also indicate that a distinction is to be drawn between criminal investigations into death and the Coroner's investigation, which involves autopsies. The "Guidebook for Indiana Coroners" outlines the role of the Coroner's investigation into deaths. The Guidebook from 1980 explains that "it may be necessary to order an autopsy to help determine identity, cause of death, time of death, and circumstances," noting further that

---

[6] In addition, the National Association of Medical Examiners (NAME) establishes Forensic Autopsy Performance Standards, which define autopsy as "[a]n examination and dissection of a dead body by a physician for the purpose of determining the cause, mechanism, or manner of death, or the seat of disease, confirming the clinical diagnosis, obtaining specimens for specialized testing, retrieving physical evidence, identifying the deceased or educating medical professionals or students." NAME, Forensic Autopsy Performance Standard (2015) at 25.

"[e]ven in most cases where the cause of death is obvious, an autopsy may be advisable and essential." (*Indiana Coroner's Guidebook*, Ind. Comm. on Forensic Science, Pg. 16, 1980). None of the reasons for performing an autopsy were based upon providing evidence for a criminal investigation.

In more recent years, the Guidebook has been expanded upon and now contains an entire section outlining the "Roles of Police Officers and Coroners." (*Indiana Coroner's Guidebook*, Ind. Comm. on Forensic Science, Sec. 301, Pg. 76, 2001). When a death is being investigated, "[l]aw enforcement officers are concerned with whether a crime has occurred," while the Coroner's role is broader and "is concerned with establishing the manner and cause of death in all unknown-cause deaths." Id. "The importance of the coroner's investigation is not diminished if a crime has not occurred." Id. The Guidebook emphasizes that the relationship between Coroners and law enforcement should be cooperative, but independent. Id. In fact, "*[i]ndependence* is perhaps the *key* element in the coroner/law enforcement relationship," especially when it comes to "rendering a determination of the manner and cause of death." Id. at 76-77. Thus, the emphasis on independence also undercuts the position that an autopsy is prepared primarily to aid in a criminal investigation.

As such, we now turn to the circumstances surrounding W.W.'s death, when the autopsy report was created. On the night of W.W.'s death, the officer who first arrived at the scene sent out the DHC (Detective Has Copy) report explaining that a child was found dead and there had been a possible homicide. (Tr. at 86, 44; Tr. Exhib. at 38.) However, Ackerman reported to police that W.W. had stopped breathing and he attempted to revive him by beating on his stomach. D.S. confirmed that Ackerman made this same account to her when he called her at work. Although two police officers were present during the autopsy and there was a brief investigation into W.W.'s death, the police seemingly had no other evidence implicating Ackerman at that time. As noted by the Illinois Supreme Court in Leach, the presence of police officers during the autopsy should not be determinative of the primary purpose, as it would be just as possible that police may be present when the cause of death is accidental.

From the time of W.W.'s death until now, Ackerman has never changed his story about what he claimed happened that day. At the time of W.W.'s death, D.S. never expressed suspicion that Ackerman had intentionally inflicted the life-ending injuries upon W.W., and I.W. was apparently never formally questioned by law enforcement, but again, given that she was barely three years old, she would have been incompetent to testify regarding any recollection that she could have provided. Moreover, nothing suggests that the investigating officers communicated with Dr. Eisele that a potential homicide investigation was underway. Thus, at the time of the autopsy, Dr. Eisele was, at most, aware that W.W. died under suspicious circumstances, which would likely be the case in most infant deaths. The autopsy report could have confirmed Ackerman's claim that there was a reason why W.W. had stopped breathing and that W.W.'s injuries were consistent with Ackerman's uneducated attempt at resuscitating W.W.

Based upon the circumstances surrounding W.W.'s death, we are not persuaded that Dr. Eisele would have known that the autopsy would primarily serve to aid the investigation and prosecution of a crime. The absence of any charges brought against Ackerman, even despite Dr. Eisele's conclusion that the manner of death was homicide, demonstrates that the autopsy report alone is not determinative of whether a police investigation or prosecution will result. Here, it was not until an eyewitness came forward, over thirty years after the offense, that the prosecution sought criminal charges. Thus, unlike the Supreme Court's conclusions in <u>Melendez-Diaz</u> and <u>Bullcoming</u>, we do not find that the autopsy report in this case was "created solely for an 'evidentiary purpose' . . . made in aid of a police investigation." <u>Bullcoming</u>, 131 S. Ct. 2717.

As the <u>Leach</u> court similarly acknowledged, we can conceive a situation in which law enforcement is deep in the midst of a homicide investigation and the circumstances surrounding the death so obviously indicate that the death was a homicide that a pathologist performing an autopsy would very clearly understand that the purpose of the report would be to aid in the criminal investigation. However, we do not think that the circumstances here support that conclusion, especially when our own statutes provide that autopsies serve "*the purpose of ascertaining the cause, seat, and nature of a disease or for the purpose of inquiring into the cause of death*." Ind.

21

Code § 16-36-2-1 (emphasis added). Neither purpose is to aid law enforcement or provide evidence for criminal investigations or prosecutions. Thus, absent the unique circumstances that could arise to demonstrate that the purpose of the autopsy report was to aid in a criminal investigation, we cannot today conclude that the autopsy report in the present case was prepared for the primary purpose of establishing or proving past events for subsequent prosecution.

We acknowledge that some jurisdictions, including the Williams plurality, have considered whether the statement implicates a targeted individual to determine whether the statement is testimonial in nature, while others have expressly rejected that this is the appropriate test. See Williams, 132 S. Ct. at 2243-44 (determining that when a sample was sent to the laboratory to be tested for DNA "its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner . . . no one at [the laboratory] could have possibly known that the profile that it produced would turn out to inculpate petitioner—or for that matter, anyone else whose DNA profile was in a law enforcement database"); Cf. Navarette, 294 P.3d at 439 ("the fact that an out-of-court statement (in this case, a forensic report) is not inherently inculpatory does not make it non-testimonial.").[7] Because it is our position that this case can be resolved based upon the primary purpose test as set out above, we decline to expressly accept or reject this more specific primary purpose standard, which considers whether a statement is inherently inculpatory or accusatory of a particular defendant.

As a final consideration, we also look to whether the autopsy report demonstrated enough formality as to render it "[a] solemn declaration or affirmation" or whether the statement bears

---

[7] It is arguable that the Melendez-Diaz court would disagree with the Williams plurality's assessment. The Melendez-Diaz court rejected the position that testimony needed to directly accuse a specific defendant of wrongdoing to present a confrontation issue. 557 U.S. at 313. The court explained that there are only two classes of witnesses, "those against the defendant and those in his favor . . . . [T]here is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." Id. at 313-14.

22

"indicia of solemnity." Crawford, 541 U.S. at 51; Davis, 547 U.S. at 836-37. In other words, does the autopsy report possess the type of formal statement that the Confrontation Clause was designed to prohibit? First, the autopsy report in this case only contained a certification that Dr. Eisele was a legally qualified physician, and he performed the autopsy in question on W.W. (Tr. Exhib. at 25.) Dr. Eisele did not certify the accuracy of the autopsy he conducted nor that a certain procedure was followed. Even though a statement need not be sworn under oath to qualify as testimonial, Bullcoming, 131 S. Ct. at 2717, the autopsy report here still lacked the requisite formality to be considered testimonial.

For example, the report in Bullcoming was labeled as a report, the analyst certified to the accuracy of the report, that he had "followed the procedures set out on the reverse of [the] report," and the report itself contained a legend referring to the municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses. Williams, 132 S. Ct. at 2233 (citing App. in Bullcoming, O.T. 2010, No. 09-10876, p. 62); Bullcoming, 131 S. Ct. at 2717. Here, the autopsy report only certified that Dr. Eisele performed the autopsy. He did not certify the accuracy of his conclusions or descriptions or to the procedures followed. There are no references to state or local statutes regarding aiding law enforcement or admission of the report in court. Finally, the autopsy report is not labeled as a report, but rather is labeled as an "Anatomical Diagnosis." Significantly, this seems to best capture what an autopsy report truly is, a medical diagnosis, not a formal attestation of fact "bearing 'indicia of solemnity.'" Williams, 132 S. Ct. at 2259, J. Thomas Concurring (citation omitted).

After examining Indiana statutes, the Coroner's Guidebook, the objective circumstances surrounding the autopsy, and the formality of the autopsy report, today we hold that the autopsy report admitted in the present case was non-testimonial. Thus, Ackerman's confrontation rights were not violated.

Accordingly, we also hold that Dr. Hawley's testimony regarding the autopsy report similarly did not violate Ackerman's confrontation rights. However, we note that even if the

autopsy report was inadmissible, Dr. Hawley could have still testified to his own independent opinion based upon his review of the autopsy report. Under Indiana Evidence Rule 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field." Dr. Hawley testified that it is common for pathologists to rely upon the autopsy reports of other pathologists and to testify based on their own review of those reports. While this rule would not allow Dr. Hawley to merely recite facts and conclusions that were stated in the autopsy report, Dr. Hawley would have been allowed to testify that his review of the autopsy reports and photographs led him to the conclusion that the manner of W.W.'s death was homicide, among other opinions he formed independently. Ackerman even appears to concede that this portion of Dr. Hawley's testimony was permissible.[8]

We hold that the trial court did not err when it overruled Ackerman's objection to the admission of the autopsy report on the grounds that it violated his constitutional confrontation rights. We also hold that the admission of Dr. Hawley's testimony regarding the autopsy report was not fundamental error, as Dr. Hawley's testimony also did not violate Ackerman's confrontation rights.

---

[8] Moreover, even jurisdictions that have found autopsy reports to be testimonial have held that a pathologist may testify to his or her own opinion developed based upon an autopsy performed by another pathologist. See Navarette, 294 P.3d at 443 ("an expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause"); See also State v. Kennedy, 735 S.E.2d 905, 920-21 (W. Va. 2012) (explaining that the surrogate pathologist's testimony was permissible to the extent that the witness expressed his "original observations and opinions," but would rise to a confrontation violation where the witness merely "served as a 'transmitter'" for the non-testifying pathologist's opinions).

## II.    Due Process

Ackerman argues that the trial court erred in denying his motion to dismiss based upon his claim that delayed prosecution violated his constitutional rights under the Due Process Clause. Although the prosecution can exercise discretion on when to bring charges, that discretion is not unlimited. Schiro v. State, 888 N.E.2d 828, 834 (Ind. Ct. App. 2008). The United States Supreme Court has recognized that a pre-indictment delay in prosecution can result in a Due Process Clause violation. United States v. Valenzuela-Bernal, 458 U.S. 858, 869 (1982). Although statutes of limitations often operate to prevent too much delay before criminal charges are brought, "even where a charge is brought within the statute of limitations, the particulars of the case may reveal that undue delay and resultant prejudice constitute a violation of due process." Patterson v. State, 495 N.E.2d 714, 718 (Ind. 1986). Despite this, the passage of time alone is not enough to establish prejudice. Id. If it were, then the Constitution would serve as a functional statute of limitation. Rather, the defendant has the burden of proving that he suffered "actual and substantial prejudice to his right to a fair trial," and upon meeting that burden must then demonstrate that "the State had no justification for delay," which may be demonstrated by showing that the State "delayed the indictment to gain a tactical advantage or for some other impermissible reason." Schiro, 888 N.E.2d at 834.

It is not disputed that there was a substantial delay between the time W.W. was killed in 1977 and when charges were brought against Ackerman in 2013. This Court does not condone such lengthy delays. However, when an especially egregious offense carries no statute of limitation, it is inevitable that at times lengthy delays will occur, and those delays will be justified under certain circumstances. The current circumstances present such a case. Ackerman has failed to establish that the prosecutorial delay rose to a due process violation.

Ackerman first argues that he was prejudiced by the deaths of potential witnesses in his favor, including: (1) Dr. Eisele, the pathologist who performed W.W.'s autopsy; (2) Officer

Richard Proffit, a first responder at the scene of W.W.'s death; and (3) Officer Noland, a first responder at the scene of W.W.'s death. In addition, two other law enforcement personnel, who responded to or were assigned to the case, no longer had any recollection of the event. Lastly, W.W.'s medical records reflecting two previous hospitalizations of W.W. were not available. After considering each of these potential detriments, we conclude that none of these issues, individually or collectively, subjected Ackerman to actual and substantial prejudice.

In Johnson v. State, the defendant similarly argued that he was prejudiced by delayed prosecution due to witnesses who were now deceased. 810 N.E.2d 772, 775 (Ind. Ct. App. 2004). However, the court concluded that no "actual prejudice" was demonstrated because the defendant only asked the court to "speculate regarding how the deceased witnesses would have helped his defense." Id. at 776. The court refused to engage in such speculation and found no showing of substantial prejudice. Id. See also e.g. Allen v. State, 813 N.E.2d 349, 366-68 (Ind. Ct. App. 2004) (explaining that even though the defendant identified deceased witnesses, witnesses whose memories had faded, and the unavailability of other documentary evidence, the defendant failed to demonstrate how this evidence would have aided his defense, and thus failed to show "actual and substantial prejudice.").

In the present case, Ackerman's primary defense is that the injuries that resulted in W.W.'s death were either not caused by him or were the unintended consequence of his attempts at resuscitating W.W. Ackerman fails to articulate how the deceased witnesses or those whose memories have now faded would have aided in either defense. None of the potential witnesses were present when W.W. died. Rather, the sole eyewitness, I.W., was still available to testify at Ackerman's trial. Furthermore, Dr. Hawley was available to be fully questioned about the possibility that W.W.'s injuries were accidental or the result of resuscitation efforts. Because Ackerman does not articulate how these witnesses would have aided his defense, we decline to continue speculation into how these witnesses would have helped Ackerman's defense. We are not suggesting that Ackerman had an impossible duty of explaining exactly how these witnesses would have testified in his favor, but he should have at least articulated reasonable inferences

regarding the knowledge those witnesses likely possessed and what relevance that information would have had to his defense.

The case of Barnett v. State exemplifies how prejudice resulting from deceased witnesses and those with fading memories can be demonstrated. 867 N.E.2d 184, 186 (Ind. Ct. App. 2007). The defendant and victim in Barnett were prison inmates. Id. at 185. A fight broke out in a prison common area, with nearly twenty other inmates potentially witnessing the attack. Id. at 185, 188. The victim was stabbed and killed. Id. at 185. Even though it was immediately known who killed the victim, and that the defendant's only claim was self-defense, the prosecution failed to bring charges for twelve years. Id. at 187. In that time, many of the inmates who had witnessed the fight and medical staff who responded were deceased or no longer remembered the event. Id. at 187-88. It is clear that testimony regarding how the fight began and progressed would be key to a claim of self-defense. The court found that the delayed prosecution substantially prejudiced the defendant. Id. at 188.

Ackerman cannot make a similar showing of prejudice. Rather, the only eyewitness to the event, I.W., and the first person to be notified of W.W.'s condition and to arrive at the scene, D.S., were both still available to testify at Ackerman's trial.

As to the absence of medical records on W.W., there is also no showing of actual prejudice. Although the medical records were not available, D.S. testified to W.W.'s prior hospitalizations, explaining that W.W. had surgery on his hip a couple of months prior to his death due to an infection. She also identified two other instances in which W.W. was taken to the hospital, once after an incident where hot chili spilled on him and another instance when he hit his lip while playing with blocks. Evidence of the prior hospitalizations was admitted, even if not in the form Ackerman preferred. "[T]he absence of cumulative testimony cannot, as a matter of law, constitute actual prejudice." Allen, 813 N.E.2d at 367 (citing United States v. Spears, 159 F.3d 1081, 1085-86 (7th Cir. 1998)). Thus, the absence of the medical records did not demonstrate actual and substantial prejudice.

Moreover, the medical records would likely not have aided Ackerman's defense when the injuries from W.W.'s prior hospitalizations seem to be in no way related to W.W.'s life-ending injuries. First, two of the injuries resulting in prior hospitalization occurred over a year before W.W.'s death. More importantly, a burn and a bumped lip do not begin to explain the massive internal injuries that caused W.W.'s death. Second, Dr. Hawley testified that only one specific head injury found on W.W. could have occurred at a prior time, but largely concluded that W.W.'s injuries on the day of his death were fresh injuries. The ambulance driver who arrived at the scene that evening also testified that W.W.'s injuries demonstrated signs that they were recent. Thus, Ackerman has failed to demonstrate how the absence of these medical records established actual and substantial prejudice.

Finally, even if Ackerman had established actual and substantial prejudice, he failed to prove that the State had no justification for delay, or had gained some tactical advantage due to the delay. At the time of W.W.'s death, the sole eyewitness to the incident was I.W., who was only three years old. There is no dispute that under the relevant evidentiary laws at the time, I.W. was not competent to stand as a witness. See Ind. Code § 35-1-31-3 (1976); Ind. Code § 34-1-14-5 (1976). Even under today's standard, which presumes that every person is a competent witness unless otherwise provided by statute or rule, it would be unlikely that a three-year-old child could be found competent to testify at trial. Ind. Evid. Rule 601. A child is only competent to testify if it can be established that he or she: "(1) understands the difference between telling a lie and telling the truth, (2) knows he or she is under a compulsion to tell the truth, and (3) knows what a true statement actually is." Kien v. State, 866 N.E.2d 377, 385 (Ind. Ct. App. 2007). It seems highly unlikely that a three-year-old would be able to comprehend that she was under oath and required to only tell the truth. Thus, the prosecution did not simply neglect to investigate or interview the sole eyewitness, but rather, recognized that under any standard, a three-year-old could not competently testify.

Because I.W.'s age at the time greatly contributed to the delay in criminal charges being brought, Ackerman attempts to emphasize that I.W. contacted police several years prior to

Detective Ellison beginning his investigation. At trial, I.W. testified that she had made such a call, but had no recollection of who she spoke to. I.W. could not even recall if she had identified herself during the conversation. There was no paper record of her call. She did not file a police report. She did not call 9-1-1, under which circumstances there would be some record of her contacting police. I.W. only remembered calling someone at the police station and asking about her brother's death, at which point she was informed that she could look into the death by examining whatever was on microfilm. However, I.W. did not testify to what she specifically said in that first call or what she asked for. It is possible that whomever she spoke to was under the impression that referring I.W. to review the microfilmed information on the case would answer her inquires. It is not apparent whether she explained that she had witnessed a murder, or that she wanted to report a murder.

It was not until February 5, 2013, that I.W. called the Indianapolis Police Department and specifically asked for the Cold Case Unit. At that time, she left a voicemail for someone in the Cold Case Unit, and Detective Ellison returned her call. Not long after, Detective Ellison met with I.W. and took her statement about what she recalled happening on the day W.W. died. Detective Ellison immediately began a new investigation and pursued charges against Ackerman. The mismanagement of a single tip made to an unidentified individual at the police station is insufficient to show that the State had no basis for delaying prosecution. See e.g. Johnson, 810 N.E.2d at 774-76 (Finding the defendant failed to demonstrate that the State had no justification for delayed prosecution, even though the police officers received a tip in 1997 from a woman claiming that "her ex-husband, James Sullivan, . . . had been involved in a 'robbery and murder' of an elderly man several years earlier," but the tip was not investigated. Again in 2000, the ex-wife told another police officer the same thing she reported in 1997, but when a detective found no open murder case from 1989, no further investigation into the tip was conducted, and an investigation that finally lead to charges being brought did not occur until Sullivan himself was arrested on unrelated charges and provided even more information about the robbery to police).

Thus, because an eyewitness to the incident unexpectedly came forward, decades after the offense, requesting that an investigation be conducted into an unsolved murder, we decline to find that the State's delay in prosecution lacked justification. First, the absence of a statute of limitation is specifically for such a scenario in which evidence implicating a specific individual in a murder may be pursued, regardless of when that evidence is discovered. Second, without the information from I.W., a new investigation would likely never have occurred, as Detective Ellison explained, cold case investigations usually arise from calls from family or witnesses. Lastly, "[d]elay and missing evidence can hurt the prosecution just as much as, if not more than, it hurts the defense." Glenn v. State, 884 N.E.2d 347, 354 (Ind. Ct. App. 2008). Here, the State also had to build its case based upon the same evidence that was available to Ackerman.

Ackerman argues that Barnett demonstrates that he has established both prejudice and no justification for the prosecution's delay. As indicated above, the demonstration of prejudice in Barnett was starkly different from Ackerman's attempt to establish prejudice. We also conclude that Barnett involves circumstances in which there was absolutely no explanation for why the State delayed prosecution. In fact, the State in Barnett admitted that no new investigation occurred after the delay to have sparked the bringing of charges and repeatedly admitted that delaying prosecution was a mistake. Barnett, 867 N.E.2d at 187-88. At the time of the offense, the State was well aware that the defendant had killed the victim, and the only dispute was whether the defendant had acted in self-defense. Id. at 187. Since the case at issue now involves the delayed discovery of crucial testimony from the sole eyewitness, we do not agree that Barnett compels the same outcome. In other words, it does not appear that "the prosecution deliberately utilize[d] delay to strengthen its position by weakening that of the defense . . . ." Schiro, 888 N.E.2d 828, 834.

We hold that under the facts of this case, delayed prosecution did not violate Ackerman's due process rights.

# III.    Sentencing

Finally, Ackerman asserts that the trial court erred by improperly considering the current sentencing range for murder when deciding his sentence. It is not disputed, and the trial court acknowledged, that Ackerman was to be "sentenced under the statute in force at the time the offense was committed." State v. Alcorn, 638 N.E.2d 1242, 1245 (Ind. 1994). Under Indiana Code § 35-1-54-1 (1976), the potential penalty for second degree murder was fifteen to twenty-five years or life in prison with the possibility of parole.

Sentencing is left to the discretion of the trial court, and abuse of that discretion arises by the court: (1) "failing to enter a sentencing statement at all"; (2) entering a sentencing statement in which the aggravating and mitigating factors are not supported by the record; (3) entering a sentencing statement that does not include reasons that are clearly supported by the record and advanced for consideration; or (4) entering a sentencing statement in which the reasons provided in the statement are "improper as a matter of law." Anglemyer, 868 N.E.2d at 490-91.

Here, the only assertion is that consideration of the present sentencing scheme was improper as a matter of law. Although the trial court imposed a sentence within the permissible range under the 1976 statutes, the court stated that under the current statutes the potential sentence would be:

> 45 to 65 years, [with] the Court beginning at 55. Good time applies. But now, with the July 1st statute changes, only 75 percent of the sentence would be served as opposed to 50 percent of the sentence of 45 to 65. Nothing changed with the range. *I take all those things into consideration* and when I look at my options, which are the 15 to 25 with credit time considered at the minimum, it's part of the sentence . . . or life with parole where parole would be considered after the service of the minimum time. The most appropriate sentence is life with parole and that's my sentence and those are my reasons.

31

(Tr. at 419-20.) (emphasis added). We agree that the current sentencing scheme was only "briefly reference[d]," but the trial court did also indicate that all of the aforementioned facts were being considered in its decision. (Appellee's Br. at 44.) To the extent that this demonstrates that the trial court allowed the current sentencing range to impact the sentence imposed upon Ackerman, we find that reliance on an inapplicable sentencing statute improper as a matter of law. Consequently, this was an abuse of discretion.

When an abuse of discretion occurs, this Court will remand for resentencing only if "we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." Anglemyer, 868 N.E.2d at 491. Here, the vast majority of the trial court's sentencing statement discussed the various aggravating circumstances present in this case. The circumstances of the offense demonstrate the egregious nature of Ackerman's crime. First, the victim was not even two years old. Ackerman was also in a position of care, custody, and control of the victim. The trial court also considered evidence that depicted Ackerman as not having a good relationship with W.W. before this incident ever occurred.

In addition, Ackerman's poor character was demonstrated by his history of other offenses, including non-support of his own child, battery, invasion of privacy, recklessness, and history of substance abuse. Ackerman had acquired three Class B Misdemeanors and three Class A Misdemeanors, which the trial court acknowledged that although they were misdemeanors, and not felonies, "they are offenses of violence." (Tr. at 418.) The trial court specifically noted that Ackerman had two convictions for "non-support of a dependent child for which he had incarcerated time at the DOC," and those courts had found that aggravating circumstances supported imposing aggravated sentences. (Id.) These aggravated sentences provide "some indication of [Ackerman's] pattern towards supporting his child . . . ." (Tr. at 418.) Ackerman also repeatedly violated probation. Thus, Ackerman's repeated violent offenses and non-support of his child continued to show his disregard for the care and safety of others.

32

As such, the explanation of the aggravating factors and Ackerman's character allows us to say with confidence that the trial court would have imposed the same sentence. Again, the trial court only references the current sentencing scheme briefly after consideration of all of the other aggravating factors. The court never explains *how* the difference in sentencing impacted his ultimate sentencing determination, or that it did at all. Rather, the court only notes what the sentencing range is now, and the extent to which credit time can be received. Thus, nothing within the sentencing statement demonstrates that this reference truly influenced the trial court's sentencing determination.

We also decline to exercise our authority under Indiana Appellate Rule 7(B), as neither the nature of the offense nor Ackerman's character would support a revised sentence. First, the nature of this offense is especially egregious. Ackerman brutally beat a small child who was completely helpless to defend himself. W.W. suffered injuries to his head, chest, abdomen, and extremities. The injuries to W.W.'s chest and abdomen were so extensive that it would require "a crushing-type force like we would typically see in a motor vehicle collision," such as an incident where "a pedestrian [was] struck by a car . . . ." (Tr. at 256.) In fact, the tissue from the front of the chest was "crushed from the front of the body down onto the spine." (Tr. at 258.) In addition, Dr. Hawley believed that the injuries showed a distinct pattern, and given the extensive internal injuries suffered, Dr. Hawley stated he "wouldn't be surprised that it was a shoe print or stomping injuries." (Tr. at 257.) The extent of the internal injuries would have been fatal within minutes. Moreover, Ackerman carried out this act in the presence of the victim's sibling, who has suffered greatly over the course of her life from having witnessed such a traumatizing event. As for Ackerman's character, he has never accepted responsibility for his actions, but rather amassed other convictions, committed violent crimes against others, and failed to support his own dependent child. As such, Ackerman's sentence was not inappropriate.

## Conclusion

We hold that the autopsy report in this case was not prepared for the primary purpose of aiding in a future criminal investigation or prosecution. Because the autopsy report was not intended to substitute as trial testimony, we conclude that the autopsy report was non-testimonial for confrontation purposes. The admission of the autopsy report did not violate Ackerman's constitutional rights under the Confrontation Clause. Accordingly, the testimony provided by the pathologist, who did not perform the autopsy, also did not rise to a confrontation violation. This holding does not mean that every autopsy report will be found non-testimonial. Such a bright-line rule would seemingly go against the fact-sensitive analysis that is demanded by the primary purpose test. Rather, the particular circumstances of this case have not persuaded this Court that the autopsy report should be found to be testimonial in nature.

We also hold that Ackerman's due process rights were not violated based upon delayed prosecution. We affirm the trial court's denial of Ackerman's motion to dismiss. Finally, we conclude that, while it would be inappropriate for the current sentencing scheme to have influenced the trial court's decision on what sentence to impose under the 1976 sentencing statute that was controlling in this case, any error was harmless. As such, Ackerman's conviction for second degree murder and sentence of life in prison with the possibility of parole are now affirmed.

Rush, C.J., Dickson, Rucker, and Massa, J.J., concur.