

**FILED**

Jan 17 2018, 7:35 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Scott King
Russell W. Brown, Jr.
Scott King Group
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James Hill,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

January 17, 2018

Court of Appeals Case No.
45A04-1702-CR-325

Appeal from the Lake Superior
Court

The Honorable Salvador Vasquez,
Judge.

Trial Court Cause No.
45G01-1609-MR-00004

**May, Judge.**

[1]    In this interlocutory appeal, James Hill appeals the denial of his motion to
dismiss the charges against him.  He argues his due process rights were violated

by the thirty-six year delay in charging him with murder,[1] murder in perpetration of robbery,[2] and Class A felony attempted robbery.[3]  He contends his defense was prejudiced because his alibi witnesses died in the intervening years.  He also claims the State was not justified in its delay.

While we agree the State's reason for delay was tenuous at best, we conclude Hill has not demonstrated prejudice.  Thus, we affirm the trial court's denial of Hill's motion to dismiss and remand.

## Facts and Procedural History

In the early morning of November 14, 1980, Hammond Police Officer Larry Pucalik was murdered during an attempted robbery at the Holiday Inn-Southeast located in Hammond, Indiana.  Later that day, Hammond Police Detective Robert Seaman received an anonymous phone call from a person who stated, "Pierre Catlett killed your cop."  (App. Vol. III at 146.)[4]

On November 18, 1980, police arrested Hill on an unrelated charge.[5]  When he was arrested, Hill "made the spontaneous utterance 'I know you guys think I

---

[1] Ind. Code § 35-42-1-1(1) (1976).

[2] Ind. Code § 35-42-1-1(2) (1976) (murder); Ind. Code § 35-42-5-1 (1977) (robbery); Ind. Code § 35-41-5-1 (1977) (attempt).

[3] Ind. Code § 35-42-5-1(1) (1977) (robbery); Ind. Code § 35-41-5-1 (1977) (attempt).

[4] There are two transcripts in the record, one for the hearing regarding Hill's motion to dismiss ("MTD Tr.") and one for Hill's request for habeas corpus ("Habeas Tr.").

[5] This arrest was related to a crime that occurred on October 5, 1980.  Hill was subsequently convicted of rape, criminal deviate conduct, and robbery for the incident occurring October 5, 1980.  In 2009, those

shot that Hammond cop.'" (*Id*. at 149.) On March 9, 1981, Hill asked jail staff if he could speak with a detective. According to the probable cause affidavit used in Hill's 2016 indictment:

> Hill confessed to detectives that he drove the vehicle used in the attempted robbery and murder of Hammond Police Officer Larry Pucalik. Hill recalled that [sic] Lee Mayes and Michael LNU[6] as the subjects who went inside of the hotel. Detectives showed Hill a spread of photographs. Hill picked out the photograph of Larry Mayes, who [sic] Hill called Lee Mayes as one of the persons who went inside of the Holiday Inn-Southeast. Hill then picked out the photograph of Pierre Catlett, who [sic] Hill called Michael LNU as the other person who went inside of the Holiday Inn-Southeast.

(*Id*.) (footnote added).

[5] On October 3, 1983, Hammond Police Detective Michael Solan, Sr. spoke with Jimmy Dale Woods, who told Detective Solan:

> [Mayes] came over to Jimmy Dale's house . . . and once Mayes entered the house, he was walking back and forth really nervous speaking out the window, so Jimmy asked him what's wrong and he said the police are looking for me. Something went wrong in

---

convictions were overturned as part of Hill's petition for post-conviction relief. In that case, the trial court found the prosecution's concealment of certain exculpatory evidence violated *Brady v. Maryland*, 373 U.S. 83 (1963). Despite its ability to do so, the State declined to retry Hill after his convictions were overturned: "After consultation with the complaining witness and in consideration of the fact that multiple witnesses are now deceased and the defendant's sentence has been completely served the State does not intend to re-try [Hill] on the original charges." (App. Vol. III at 51.) Hill has filed a federal lawsuit against Hammond Police and certain officers involved in his 1980 conviction for civil rights violations, and that suit was pending when the State charged him with the murder at issue herein. (*See* MTD Tr. at 31-4.)

[6] "LNU" presumably means "last name unknown."

Hammond. A security guard was shot and eventually he asked for some money to get out of town which [sic] his mother gave him $160, I believe, to Mayes to get out of town and Mayes went to Indianapolis.

(MTD Tr. at 55.) When asked about the original investigation from the 1980s, Detective Solan indicated:

We had substantial evidence, but we did not have enough evidence -- we had substantial evidence, but my opinion, I was the one that would decide if we were going to charge. We had substantial evidence, but we weren't going to charge, roll the dice because we had some problems with the investigation at that time so we continued on.

(*Id*. at 56.) Detective Solan testified the investigation into Officer Pucalik's murder stymied in 1992 or 1993, with no charges filed.

[6] In 2009, Woods was being investigated for federal firearms and drug trafficking crimes. Special Agent Jason Gore submitted, as part of a probable cause affidavit, that Woods told Special Agent Gore:

In 1980 [Woods] was living with his mother Betty Schular, now deceased, in Gary, Indiana. Woods recalled that one evening Larry Mayes came over to his house in a very excited manner. Woods recalled that Mayes told Schuler "I think I did something today, I think I killed somebody". [sic] Woods stated that Mayes told him and Schuler that he was in trouble and needed some money to get out of town.

Woods stated that Mayes went on to say that he, (Mayes), James HILL and Mike LNU were driving around looking to rob someone. Woods recalled that Mayes stated that they found a

Holiday Inn that only had one female desk clerk. Woods remembered Mayes stating that they figured the desk clerk was alone and would be an easy target. Woods explained that Mayes told him that during the robbery, a security guard came out from the backroom, and went for his gun. Woods stated that Mayes told him he shot the security guard and fled the area without getting any money from the clerk. Woods recalled that Vincent Johnson was also at his house the night Mayes came over.

Woods stated that he and Schuler gave Mayes some drugs to calm him down and some money to get out of town. Woods believed that Mayes went to Indianapolis to hide out. Woods recalled that the following Monday, Mayes returned back to Gary, Indiana and came over to Schuler's house again. Woods stated that Mayes told him that the guy he shot was an ex-cop and a military hero.

(App. Vol. III at 149-50.) Based on Woods' statement, Special Agent Gore also interviewed Vincent Johnson, who corroborated portions of Woods' version of events.

[7] Further, Special Agent Gore testified Woods gave him additional information in 2009 "tying Mr. Hill and Mayes together." (MTD Tr. at 44). He testified:

Prior to that, there is -- had been a strong denial from both Mayes and Hill that they even knew each other. Mr. Woods put them together at his house. He even gave a specific story where Mr. Mayes who's older than Mr. Hill came and was going to sell him a couch or brought him a couch, to his home in Gary. And along with him was James Hill and that was the first time that he had met James Hill. That information, your Honor, is brand new. It was -- it was showing an association that, in fact, Mr. Hill and Mayes did know each other prior to the events that occurred November 17, 1980, and it showed that they did know

each other, that they did have a relationship. That was information that was never provided to Hammond [Police Department].

(*Id.*)

In early 2011, the Northwest Indiana Major Crimes Taskforce reopened the investigation into Officer Pucalik's murder. Special Agent Gore reviewed old files and re-interviewed witnesses. On June 22, 2012, the State charged Hill, Mayes, and Catlett with Officer Pucalik's murder. The charge against Catlett was dismissed because he was serving another sentence in Illinois. The charge against Mayes was dismissed after he suffered a "cerebral vascular accident," (*id.* at 23), and was deemed incompetent to stand trial. On March 27, 2014, the charge against Hill was dismissed. When asked why the charge was dismissed against Hill, Special Agent Gore testified:

> [T]his is my understanding coming from David Urbanski who was the Lake County prosecutor who was handling the case, and it was because the evidence that we had, the case that we had against Mr. Hill was tied to Mr. Mayes. The two cases were in part together. Mr. Catlett lives in Illinois. The case against him, some of the evidence is the same, but Mr. Hill and Mayes are tied together. And Mr. Urbanksi [sic] told me that the reason why he dropped the case against Mr. Hill was that we had to separate and -- we could only make sure we had the evidence that we could use against Mr. Hill because not all the same evidence, statements, et cetera, could be used against, you know, that was used against Mayes could be used against Hill. They were tied together.

(*Id.* at 24.)

[9] On September 1, 2016, the State again filed charges against Hill for the events leading to the death of Officer Pucalik, including murder, murder in perpetration of robbery, and Class A felony attempted robbery. On December 2, 2016, Hill filed a motion to dismiss the charges against him, arguing the State's delay in bringing charges against him denied him a defense. Hill stated his great-uncle, James Stokes, and his great-grandmother, Elnoria Stokes, would have testified that they lived with Hill at the time and "Mr. Hill was home the entire night and did not leave the residence." (App. Vol. III at 198.) However, James died in 2008 and Elnoria died in 1996, and thus were unavailable as witnesses. The State stated in its memorandum in opposition of Hill's motion to dismiss "other relatives of the Defendant, also residing with Elnoria Stokes at the time of the murder, are available to testify, and have made statements that Defendant often went out during the week[.]" (*Id*. at 217.)

[10] The trial court held a hearing on Hill's Motion to Dismiss on January 13, 2017, and denied his motion the same day. The trial court found:

> 6. In this case, notwithstanding the prejudice proffered by the Defendant (the death of potential alibi witnesses), the State has presented information and new evidence to support the delay, such as, inter alia, the re-interview of Jimmy Dale Woods that ties the three suspects [Hill, Catlett, and Mayes] together during the time period of November 1980.
>
> 7. Furthermore, the Court finds that the State has gained no tactical advantage in this delay since several potential witness [sic] are no longer available to it due to death.

(App. Vol. IV at 50.)

On February 3, 2017, Hill requested the trial court certify its order for interlocutory appeal. The trial court granted his request the same day. On March 24, 2017, our court accepted jurisdiction over Hill's interlocutory appeal of the denial of his motion to dismiss.

# Discussion and Decision[7]

Our standard of review in cases involving a criminal defendant's motion to dismiss is well-settled:

> A defendant has the burden of proving, by a preponderance of the evidence, all facts necessary to support a motion to dismiss. *Townsend v. State*, 793 N.E.2d 1092, 1093 (Ind. Ct. App. 2003), *trans. denied*. When a party appeals from a negative judgment, we will reverse the trial court's ruling only if the evidence is without conflict and leads inescapably to the conclusion that the party was entitled to dismissal. *Id.*

*Johnson v. State*, 810 N.E.2d 772, 775 (Ind. Ct. App. 2004), *trans. denied*. When examining a motion to dismiss for pre-indictment delay, our analysis is guided by our Indiana Supreme Court's opinion in *Ackerman v. State*, 51 N.E.3d 171 (Ind. 2016), *cert. denied* 137 S. Ct. 475 (2016):

---

[7] We held oral argument regarding this matter on December 18, 2017, at Mississinewa High School in Gas City, Indiana. We thank the students and staff for their hospitality and counsel for their able presentations.

> Although the prosecution can exercise discretion on when to bring charges, that discretion is not unlimited. *Schiro v. State*, 888 N.E.2d 828, 834 (Ind. Ct. App. 2008). The United States Supreme Court has recognized that a pre-indictment delay in prosecution can result in a Due Process Clause violation. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 869, 102 S. Ct. 3440, 73 L.Ed.2d 1193 (1982). Although statutes of limitations often operate to prevent too much delay before criminal charges are brought, "even where a charge is brought within the statute of limitations, the particulars of the case may reveal that undue delay and resultant prejudice constitute a violation of due process." *Patterson v. State*, 495 N.E.2d 714, 718 (Ind. 1986). Despite this, the passage of time alone is not enough to establish prejudice. *Id*. If it were, then the Constitution would serve as a functional statute of limitation. Rather, the defendant has the burden of proving that he suffered "actual and substantial prejudice to his right to a fair trial," and upon meeting that burden must then demonstrate that "the State had no justification for delay," which may be demonstrated by showing that the State "delayed the indictment to gain a tactical advantage or for some other impermissible reason." *Schiro*, 888 N.E.2d at 834.

*Id*. at 189-90. Hill argues the trial court abused its discretion when it denied his motion to dismiss the charges against him because the passage of time had prejudiced his ability to bring forth witnesses in his own defense.

[13] Hill relies on *Barnett v. State*, 867 N.E.2d 184 (Ind. Ct. App. 2007), *trans. denied*, in which our court held the State's twelve-year delay in filing murder charges against Barnett violated Barnett's due process rights. In that case, Barnett was involved in a physical confrontation with another inmate, Combs, in 1993. Combs died as a result of that altercation. The State charged Barnett with Combs' murder on July 7, 2005.

[14] Barnett argued the State's unjust delay in bringing the charge against him prejudiced his defense because many witnesses were dead or unable to be located and, if they were able to testify, the passage of time had faded the witnesses' memories. The record indicated Detective Michael Minnicus investigated the incident in 1993 and submitted the findings of his investigation and a potential witness list to the prosecutor's office. However, the prosecutor's office did not conduct a follow-up investigation in 1993. Detective Minnicus testified "that the case had been brought to his attention numerous times between 1993 and 2005," *id*. at 187, and there was confusion regarding who was handling the case during that time. The State conceded "that the investigators and prosecutors on Barnett's case made a mistake by waiting twelve years to prosecute him." *Id*.

[15] Our court examined whether Barnett was prejudiced by an "inability to conduct a proper investigation, to interview and depose eyewitnesses, and to prepare a proper defense." *Id*. We determined Barnett had demonstrated prejudice in the State's delay in filing charges because a significant number of witnesses to the incident with Combs were dead or could not be located. In addition, Barnett presented evidence those who were there and could be interviewed had limited memories of the event. We held "Barnett was clearly prejudiced by the State's unexplained and unjustified delay - whether intentional or negligent - in bringing charges." *Id*. at 188.

[16] Hill argues his case is analogous to the facts in *Barnett*, as he was prejudiced by the State's delay in filing charges because his great-uncle and great-grandmother

would have testified "he was home the entire night and did not leave the residence." (Br. of Appellant at 11.) We disagree.

[17] "A defendant must do more than show that a particular witness is unavailable and that the witness' testimony would have helped the defense. He must also show that the witness would have testified and withstood cross-examination, and that the jury would have found the witness credible." *United States v. Spears*, 159 F.3d 1081, 1085-6 (7th Cir. 1998), *reh'g and suggestion for reh'g en banc denied*, *cert denied* 528 U.S. 896 (1999). A panel of our court used the Seventh Circuit's holding in *Spears* to support its holding in *Schiro*, a case with facts very similar to those before us here. *See Schiro*, 888 N.E.2d at 834 (citing *Spears* as authority).

[18] In *Schiro*, the State delayed charging Schiro for twenty-five years for crimes associated with two incidents that allegedly occurred in 1980. Schiro argued he was prejudiced by the delay because his parents, whom he would have called as alibi witnesses were available due to death and infirmary. We rejected Schiro's argument as speculative, as he "offered no testimony, affidavit, or depositions in support of this claim." *Id.* at 835.

[19] The same is true here. Hill argued, as part of his motion to dismiss:

> 6. . . .Mr. Hill's defense against these allegations is that he was not involved.
>
> 7. Had the State not delayed in bringing these charges, Mr. Hill would have filed a Notice of Alibi and named his Great-uncle,

James Stokes and Great-grandmother, Elnoria Stokes, as alibi witnesses.

8. James Stokes would have testified that in November 1980 he lived with Mr. Hill and Elnoia [sic] Stokes at 2379 Fillmore St., Gary, IN.

9. James Stokes would have further testified that he was home the night of November 13 through the early morning hours of November 14, 1980 and Mr. Hill and Elnoria Stokes were also home.

10. James Stokes would have further testified that Mr. Hill was home the entire night and did not leave the house.

11. Similarly, Elnoria Stokes would have testified that both James Stokes and Mr. Hill lived with her at 2379 Fillmore St., Gary, IN.

12. Elnoria Stokes would have further testified that she was home the night of November 13 through the early morning hours of November 14, 1980 and James Stokes and Mr. Hill were also home that night.

13. Elnoria Stokes would have further testified that Mr. Hill was home the entire night and did not leave the residence.

14. This evidence would be crucial to Mr. Hill's defense.

15. Unfortunately, James Stokes died in 2008 and Elnoria Stokes died in 1996.

16. Due to the State's delay in bringing charges, Mr. Hill has lost the ability to present a defense.

17. The inability to call these witnesses to testify at trial in this matter caused an actual and substantial prejudice to Mr. Hill's right to a fair trial.

(App. Vol. III at 197-8.)

[20] Unlike Schiro, Hill provided an affidavit wherein he indicated he was home the night of Officer Pucalik's murder. However, we note, as the trial court did, that Hill did not present an alibi defense as part of his 2012 indictment for the same crime. (*See* MTD Tr. at 87) ("You offer alibi, but I can't ignore the idea that in 2013 [sic] when the case was submitted and later dismissed in 2015 that no alibi was submitted, yet there is one now."). Additionally, the State indicated in its memorandum in opposition of Hill's motion to dismiss "other relatives of the Defendant, also residing with Elnoria Stokes at the time of the murder, are available to testify, and have made statements that Defendant often went out during the week[.]" (App. Vol. III at 217.)

# Conclusion

[21] We conclude Hill has not met the bar set by *Spears* and adopted by this court in *Schiro*: he has not shown Elnoria and James "would have testified and withstood cross-examination," *Spears*, 159 F.3d at 1085, and that the jury would

have found them credible.[8]  Thus he has not demonstrated he suffered actual and substantial prejudice to his right to a fair trial.  Accordingly, we affirm the decision of the trial court and remand.

[22]    Affirmed and remanded.

Baker, J., and Altice, J., concur.

---

[8] As we conclude Hill has not met his burden to demonstrate he suffered actual and substantial prejudice to his right to a fair trial, we need not consider the other prong of the test - whether the State's delay was justified. *See Ackerman*, 51 N.E.3d at 189-90 ("the defendant has the burden of proving that he suffered 'actual and substantial prejudice to his right to a fair trial,' *and upon meeting that burden* must then demonstrate that 'the State had no justification for delay[.]'") (emphasis added) (internal citations omitted).