

FILED

May 19 2023, 10:14 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jonathan D. Harwell
Harwell Legal Counsel LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana
Indianapolis, Indiana

Justin F. Roebel
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James H. Higgason III, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | May 19, 2023 <br><br> Court of Appeals Case No. <br> 22A-CR-2000 <br><br> Appeal from the Lake County <br> Superior Court <br><br> The Honorable Salvador Vasquez, <br> Judge <br><br> Trial Court Cause No. <br> 45G01-2101-MR-6 |

**Opinion by Judge May**
Judge Foley and Senior Judge Najam concur.

**May, Judge.**

James Harold Higgason III appeals his three convictions of murder.[1] He presents multiple issues for our review, which we restate as:

> 1. Whether the trial court abused its discretion when it denied Higgason's motion to dismiss based on the State's twenty-three-year delay in filing charges;
>
> 2. Whether the trial court abused its discretion when it admitted two recordings of phone calls between David Copley and Higgason because:
>
>> 2.1 the State laid insufficient foundation for the admission of the digitized recording ("Digitized Recording") of the cassette tapes ("Cassette Tapes") of Copley's conversation with Higgason; and
>>
>> 2.2 the Digitized Recording was not the best evidence possible when the original Cassette Tapes were available;
>
> 3. Whether the trial court abused its discretion when it denied Higgason's request for mistrial; and
>
> 4. Whether the trial court committed reversible error when it responded to a jury question without first notifying counsel.

We affirm.

---

[1] Ind. Code § 35-42-1-1.

# Facts and Procedural History[2]

On January 18, 1998, Hammond police received a 911 call reporting three deceased individuals in a house at 4604 Torrence Avenue. When police arrived at the house, they found the bodies of Elva Tamez, Jerod Hodge, and sixteen-year-old T.R. All three victims had been severely beaten and suffered lacerations, skull fractures, and brain hemorrhages. Tamez had a broken fingernail, and Hodge had lacerations on his forearms and one hand, which were consistent with defensive wounds.

Detective Thomas Fielden of the Hammond Police Department was the lead investigator. One of Tamez's neighbors, Donna Lushbaugh, told him she purchased drugs at the house the night before the murders. Lushbaugh told police she knew Higgason because she attended high school with him. Lushbaugh indicated she smoked cocaine with Higgason and David Copley that night and she saw Higgason trade a shotgun for cocaine that evening as well. In a subsequent statement, Higgason confirmed Lushbaugh's presence at Tamez's house that evening. Police found a Browning 12-gauge shotgun in the attic of Tamez's house.

Another of Tamez's neighbors, Anna Flores, saw "people moving in [Tamez's] house" around "6:30, a quarter til 7:00" on the morning of January 18, 1998.

---

[2] We held oral argument on this case on April 18, 2023, at Franklin College in Franklin, Indiana. We thank Franklin College and the Johnson County Bar Association for their hospitality. We also thank counsel for their able presentations.

(Tr. Vol. V at 127.) A city worker saw a "taller individual he said had an orange hat on and the shorter individual had a dark hoody [sic] -- wearing a dark hoody [sic]" in the area of Tamez's house on the morning of January 18, 1998. (Tr. Vol. IV at 93.) Copley later surrendered a dark hoodie to police and Higgason's grandmother, Marlene Dodge, told police Higgason had an orange hat.

[5] After police determined the shotgun found in Tamez's house belonged to Higgason, he gave a statement to police. During that statement on February 9, 1998, Higgason admitted he was at Tamez's house several times on the night of January 17-18, 1998, to purchase cocaine, and he also admitted he traded his shotgun for cocaine. He told police he had been there with Copley and had seen Lushbaugh there. Higgason stated he traded the gun for $50.00 worth of cocaine, and then left and "that was the last time I was there." (Ex. Vol. II at 158.) Higgason told police, "I did not kill nobody." (*Id.* at 162) (errors in original). On February 13, 1998, Copley gave a statement to police that was "pretty much consistent" with Higgason's statement. (Tr. Vol. IV at 73.)

[6] Several months later, Detective Fielden received a call from an FBI agent[3] indicating Copley had told some of his family members that Copley "was having a problem with his conscious [sic] and that he was involved with – with these murders at 4604 Torrence." (*Id*. at 74.) Officer Fielden spoke with

---

[3] At the beginning of the investigation into the murders, the Hammond Police Department requested the FBI's assistance in investigating the crimes.

Copley on May 21, 1998, while Copley was in a rehabilitation program at a Salvation Army. Copley told Officer Fielden that Copley's earlier statement was true, "except for the part of when him and James Higgason left." (*Id.* at 76.) Copley told Officer Fielden that instead of leaving, he and Higgason "were there all night" and "ended up killing . . . the two drug dealers to rob them of their cocaine and their money." (*Id.*)

[7] During trial, Copley testified that on January 17-18, 1998, he and Higgason had been at Tamez's house "smoking crack . . . [for] probably five or six hours[.]" (Tr. Vol. V at 172.) Copley also testified he told police that in the early morning hours of January 18, 1998, Higgason asked Tamez to go outside and get Higgason some cigarettes. Higgason then locked the door of Tamez's house. Higgason noticed Hodge and T.R. had fallen asleep. Higgason told Copley "he wanted to whack these guys . . . to take whatever money or drugs they had." (*Id.* at 175.)

[8] Higgason then grabbed a closet pole and handed Copley a board. Higgason then started to "whack" Hodge and T.R. with the closet pole, while saying "Die, motherfucker, die." (*Id.* at 176.) Copley testified he hit Hodge and Higgason hit both T.R. and Hodge multiple times. Tamez began knocking at the door, and Higgason told Copley to let her in. Copley ran down the block but saw Higgason beat Tamez and kick the door shut. When Higgason later caught up with Copley, Higgason started taking off his bloody clothes and putting them in the trash. Higgason also used snow to remove blood from his

body. Higgason told Copley to "keep [his] mouth shut" and that "loose lips sink ships." (*Id*. at 178.)

[9] The day after Copley gave his statement to police, they returned to the rehabilitation center and asked Copley to call Higgason. Copley signed a form giving the police consent to record the phone call and gave police Higgason's telephone number. After attaching a suction cup microphone to the receiver, police recorded the phone call between Copley and Higgason on a cassette tape. Copley called Higgason at the home of Marlene Dodge, Higgason's grandmother. Dodge answered the phone. Copley asked Dodge, "is Jim around?" (Ex. 36 at 1:28-9.) Dodge said he was, but he was sleeping. Copley asked Dodge to wake him up.

[10] During the call, Copley told Higgason he was going to tell police what happened, and Higgason replied, "No, dude, . . . you are talking about life, dude, forever. You are talking about going in for life, dude." (Ex. 36 at 03:19-27.) Higgason told Copley, "don't worry about it" (*id*. at 3:49-50) because "we didn't do it." (*Id*. at 4:24-5.) Higgason told Copley that Higgason heard police speak with witness Lundsford and "they're saying her times ain't matched." (*Id*. at 4:30-1) (errors in original). Higgason went on to state "there ain't nobody that knows but me and you[.]" (*Id*. at 6:35-6.) When Copley continued to suggest Copley should confess to the police, Higgason told him a conviction would result in the "electric chair, bro" (*id*. at 12-11-2), and asked Copley "why you want to take me down, Dave? Why you want to hurt me like that?" (*Id*. at 12:51-5.)

[11]     Police returned to the rehabilitation center two days later and Copley again called Higgason using the same recording process. During this second call, Higgason answered the phone. Higgason reminded Copley that Higgason had an alibi because Dodge told police she knew Higgason was at her house the morning of January 18, 1998. Copley told Higgason that Copley had talked to Copley's pastor and "told him everything really." (Ex. 37 at 3:57-8.) Higgason said, "dude, I didn't do it, I don't remember doing it." (*Id.* at 4:13-6.) Higgason told Copley to "get your head together, bro" (*id.* at 4:33-4), and stated, "I know we fucked up, we both fucked up, dude." (*Id.* at 4:42-6.) Higgason later told Copley, "you should have never told anybody else, dude" (*id.* at 7:31-3), and "we can't fucking go ahead and squeal on ourselves, bro." (*Id.* at 08:04-6.) Higgason made additional statements, including "if I don't want to go sit in prison for at least twenty years then I got to keep my mouth shut, that I gotta get out of this one" because "I dug a hole, dude, . . . with the dirt up to my neck" (*Id.* at 13:12-9) (errors in original). He also said, "the only way out is to get away with it and never do it again, and leave fucking shit alone, dude." (*Id.* at 13:25-37) (errors in original). Detective Fielden gave the prosecutor's office the fruits of his investigation several times during the initial investigatory period, but the prosecutor's office did not charge anyone in connection with the murders at that time.

[12]     In 2008, various items collected from the crime scene were sent to the Indiana State Police laboratory for DNA testing. DNA testing of a sample of cells from Tamez's fingernails showed Copley was a minor DNA contributor and

Higgason and Hodge could not be excluded as contributors. Police met with Higgason regarding the murders. Higgason again denied he was involved in the crime and told police he had heard James Williams, a local drug dealer who sold drugs out of Tamez's house in 1998, committed the murders. The State did not prosecute any suspects for the murders at that time.

[13] In 2020, the State Police conducted additional DNA testing on samples from three of Tamez's other fingernails. The results from those samples indicated the DNA under Tamez's fingernails likely came from Tamez, Copley, Higgason, and an unknown fourth person. Based thereon, on January 11, 2021, the State charged Higgason and Copley with three counts of murder and three counts of felony murder. On May 1, 2021, Copley and the State entered into plea agreement wherein Copley pled guilty to one count of murder in return for a "complete and detailed sworn statement about his involvement in the crime." (Ex. Vol. II at 166.) The trial court sentenced Copley to forty-five years.

[14] On May 3, 2022, Higgason filed a motion to dismiss the charges against him. He argued the evidence upon which the State based its charges against him was "virtually the same evidence it has had in its possession since 1998" and the "delay in filing the charges is really inexplicable." (App. Vol. II at 41.) Higgason asserted that, because of the delay, he had "lost the ability to present a defense or his ability to present a defense has been significantly impaired . . . in violation of his right to a fair trial." (*Id.* at 42.) Finally, Higgason contended his "inability to call [] witnesses to testify at a trial in this matter caused an actual and substantial prejudice to Mr. Higgasons' [sic] right to a fair trial."

(*Id*.)  In its response, the State noted the newly-discovered DNA evidence and Copley's recent agreement to testify as part of his plea agreement.  The State argued Higgason "had not demonstrated any clear prejudice to his defense." (*Id*. at 48.)

[15]   At the hearing on the motion to dismiss, Higgason entered into evidence a September 9, 1998, statement from Jack Wilson.  In his statement to Detective Fielden, Wilson indicated Copley told Wilson "he beat them to death" and Copley's "buddy[,]" presumably Higgason, "beat them too."  (Ex. Vol. II at 50.)  Higgason indicated Wilson could not be subpoenaed to testify because the State had not provided Wilson's last known address to Higgason.  Wilson's statement, Higgason asserted, was "the exact type of evidence that could exonerate Mr. Higgason from these crimes charged."  (Tr. Vol. II at 184.) Additionally, Higgason noted two witnesses, Dodge and C.W. Smith,[4] had passed away in the interim twenty-three years between the crime and the filing of the State's charges against him.  Higgason argued the unavailability of these witnesses prejudiced him because without them he was unable to properly prepare a defense.

[16]   The State responded Higgason had not provided evidence to substantiate his claims of Wilson's and Dodge's unavailability, as he did not provide death certificates.  Further, the State indicated a quick internet search revealed a

---

[4] At some point during the initial investigation, Smith, Tamez's boyfriend, was considered a suspect.

person named Jack Wilson with same middle name and date of birth as the Jack Wilson who provided the signed statement in 1998 was presently incarcerated in Michigan. The trial court found Higgason had not demonstrated "actual and substantial prejudice" in the delay and denied Higgason's motion to dismiss. (*Id*. at 202.)

[17] On May 23, 2022, the trial court began Higgason's jury trial. During trial, the State offered into evidence the Digitized Recording of the Cassette Tapes that Detective Fielden had made of Copley's two telephone calls with Higgason. Higgason objected, arguing the State did not properly provide a chain of custody for the Digitized Recording. The trial court allowed the State and Higgason to ask Forensic Video Technician Keisha Ricketts questions regarding the chain of custody of the Digitized Recordings. After that questioning, the trial court overruled Higgason's objection. The trial court noted Higgason's continuing objection to admission of the Digitized Recordings based on the chain of custody issue.

[18] When the State offered the Digitized Recording of Copley's first telephone conversation with Higgason, Higgason objected to the admission on the basis that the Digitized Recording was not the best evidence because the Cassette Tapes existed and should be admitted under the best evidence rule. The trial court denied the objection because Ricketts testified earlier in the trial that the Digitized Recording was an exact copy of the Cassette Tapes that Detective Fielden made of telephone conversations between Copley and a second party. Because of the poor quality of the Digitized Recording, the State provided the

jurors with a transcript of the Cassette Tapes,[5] and the trial court reminded jurors the Digitized Recording, not the transcript, was the evidence.

[19] When providing the jury with the transcript, the trial court stated, "you have a -- a transcript of the original telephone call between the -- these two, your witness and the defendant." (Tr. Vol. V at 202.) Higgason objected to the admission of the Digitized Recording again. He argued the trial court made an improper statement identifying Higgason as the other person on the phone call because there was no evidence at that time that would identify Higgason as the other person. The trial court overruled the objection, but stated to the jury, "[s]o, … to be clear – and to be very, very clear. Mr. Copley indicated that he made a phone call. He made a phone call at the request of Detective Fielden. This is the recorded phone call that the – that the witness has indicated he has reviewed and is about to play." (*Id*. at 204.) The trial court clarified, "Earlier I said between the – the witness and the defendant. I did misspeak. I think the testimony thus far is it's a recorded phone call that was done by Mr. Copley." (*Id*.) The trial court then reemphasized to the jury that "[t]he transcript is only to assist you. If there's any discrepancy between the transcript and the tape, it's the tape that matters most." (*Id*.) During admission of the portion of the

---

[5] Detective Fielden did not testify regarding whether he made the transcript from the Cassette Tape or the Digitized Recording. Regarding the issue, the trial court stated, during the discussion surrounding the admissibility of the Digitized Recording that "I guess I'm presuming that he took this transcript from the original, not any enhancement." (Tr. Vol. V at 201.)

Digitized Recording containing the second call, Higgason objected "incorporat[ing] all of [his] previous arguments." (*Id*. at 209.)

[20] After the Digitized Recording was published to the jury and Copley testified that Higgason was the other person on the calls, Higgason requested a mistrial "based on the inference that the court has concluded that the . . . statements are attributable to Mr. Higgason." (*Id*. at 218.) Higgason argued that "while I understand the Court gave a limiting instruction . . . it's very difficult to unring that bell in front of this jury." (*Id*.) Higgason stated the trial court's earlier mischaracterization that the phone call was between Copley and Higgason was such that he could no longer receive a fair trial. The trial court denied Higgason's request for a mistrial and stated it believed the jurors would follow its earlier admonishment to disregard the trial court's statement that the recording was between Copley and Higgason. The trial court then recessed for the evening. Higgason renewed his request for a mistrial when the trial court convened the next morning. The trial court again denied Higgason's motion for mistrial.

[21] At the end of presentation of evidence by both parties, the jury went into deliberation. Approximately three hours later, the jury told the trial court it had reached a verdict. Before the trial court received the verdicts, it stated:

> During deliberations there were questions posed to the Court. The first question reads as follows: And I'll read the question into the record, as well as the response. "Can we see the transcripts of Higgason's statements, proffer agreement, and both Copley's statements as submitted by the defense?" The response is, "The

> Court is in receipt of your question. All the evidence that was properly admitted is in your possession. The Court is not permitted to provide transcripts.
>
> The second question that came in reads as follows: "For our clarification, if we believe the defendant was present but did not inflict any blows on one or more of the counts being considered, would that be guilty or not guilty under Indiana law? This one I replied to as follows: "The Court is in receipt of your question. The Court is not permitted to answer this question."

(Tr. Vol. VII at 135-6.) The jury then returned guilty verdicts for all charges against Higgason. After the jury foreperson read the verdicts, Higgason renewed his motion for mistrial "on the grounds previously stated[,]" which the trial court denied. (*Id*. at 140.)

[22] The trial court entered verdicts for the three murder charges, noting it "believe[d] [the felony murder counts] merge." (*Id*.) On June 23, 2022, Higgason filed a motion to correct error, reasserting his objections and request for mistrial. Higgason also argued the trial court erred when it did not contact Higgason after the jury's second question. On July 24, 2022, the trial court held a hearing on the motion to correct error and on Higgason's sentence. The trial court denied Higgason's motion to correct error. After testimony and argument presented by both parties, the trial court sentenced Higgason to 60 years for each murder, to be served consecutive to one another, for an aggregate sentence of 180 years.

# Discussion

## 1. Motion to Dismiss

Higgason argues the trial court erred when it denied his motion to dismiss because the twenty-three-year delay between the crime and charging resulted in prejudice making a fair trial impossible. Our standard of review in cases involving a criminal defendant's motion to dismiss is well-settled:

> A defendant has the burden of proving, by a preponderance of the evidence, all facts necessary to support a motion to dismiss. When a party appeals from a negative judgment, we will reverse the trial court's ruling only if the evidence is without conflict and leads inescapably to the conclusion that the party was entitled to dismissal.

*Johnson v. State*, 810 N.E.2d 772, 775 (Ind. Ct. App. 2004) (internal citations omitted), *trans. denied.* When examining a motion to dismiss for pre-indictment delay, our analysis is guided by our Indiana Supreme Court's opinion in *Ackerman v. State*, 51 N.E.3d 171 (Ind. 2016), *cert. denied* 137 S. Ct. 475 (2016):

> Although the prosecution can exercise discretion on when to bring charges, that discretion is not unlimited. The United States Supreme Court has recognized that a pre-indictment delay in prosecution can result in a Due Process Clause violation. Although statutes of limitations often operate to prevent too much delay before criminal charges are brought, even where a charge is brought within the statute of limitations, the particulars of the case may reveal that undue delay and resultant prejudice constitute a violation of due process. Despite this, the passage of time alone is not enough to establish prejudice. If it were, then the Constitution would serve as a functional statute of limitation.

> Rather, *the defendant has the burden of proving that he suffered actual and substantial prejudice to his right to a fair trial, and upon meeting that burden must then demonstrate that the State had no justification for delay*, which may be demonstrated by showing that the State delayed the indictment to gain a tactical advantage or for some other impermissible reason.

*Id*. at 189-90 (internal quotations and citations omitted) (emphasis added). "[I]f the prosecution deliberately utilizes delay to strengthen its position by weakening that of the defense or otherwise impairs a defendant's right to a fair trial, an inordinate pre-indictment delay may be found to violate a defendant's due process rights. *Johnson*, 810 N.E.2d at 775.

[24] In support of his argument that the State's twenty-three-year delay in filing charges against him unduly prejudiced him, Higgason cites *Barnett v. State*, 867 N.E.2d 184 (Ind. Ct. App. 2007), *trans. denied*. In that case, Barnett, while incarcerated, got into a physical altercation with a fellow inmate, Ricky Combs, on January 26, 1993. *Id*. at 185. After the two men scuffled, Barnett stabbed Combs, who subsequently died. *Id*. Guards and several inmates saw the incident. *Id*. Because of his injuries, Barnett was taken to the prison infirmary, where he was questioned. *Id*. Barnett "claimed he did not mean to kill Combs and explained that on the night before, Combs had threatened to kill him in the morning." *Id*.

[25] The State did not file a charge against Barnett related to Combs's murder until July 7, 2005, when the State charged Barnett with murder. *Id*. On February 27, 2006, Barnett filed a motion to dismiss and argued the State's delay in bringing

charges violated his due process rights. *Id*. After a hearing, the trial court denied Barnett's motion to dismiss because "it did not yet have enough evidence before it to decide whether Barnett's right to a fair trial was at risk[.]" *Id*. at 186. Barnett was tried by jury the same day, and the jury returned a not guilty verdict as to the charge of murder and found Barnett guilty of the lesser-included offense of voluntary manslaughter. *Id*. The trial court entered a conviction of voluntary manslaughter and sentenced Barnett to thirty years imprisonment. *Id*.

[26] On appeal, Barnett argued the State violated his due process rights when it delayed filing the charges against him in Combs's murder for twelve years. *Id*. Regarding prejudice stemming from the delay, Barnett argued:

> The unjust delay by the State in bringing the charge against him impaired his ability to adequately defend himself because several key witnesses had died or were unable to be located for purposes of testifying at his trial. Furthermore, Barnett claims that his ability to cross-examine those witnesses who did testify was greatly diminished by the witnesses' faded memories.

*Id*. at 187. In determining whether Barnett demonstrated real and substantial prejudice, this court explained:

> [W]e grapple with the issue of whether Barnett was actually prejudiced by the delay due to missing and deceased witnesses, as well as an inability to effectively cross-examine witnesses. To require that the defendant show more specific prejudice than this would place an impossible burden on the appellant. More prejudice can only be demonstrated by showing what the testimony of those witnesses would have been. It is precisely the

lack of this opportunity that prejudices Barnett. Even where there are recorded statements, the potential for prejudice is not foreclosed because of the inability to challenge such statements. The prejudice lies in the defendant's inability to conduct a proper investigation, to interview and depose eyewitnesses, and to prepare a proper defense.

*Id*. This court noted several witnesses were either deceased or could not be located in 2005, including

Ron Cook, the chief internal investigator at the Pendleton Correctional Facility; Dr. Chavez and Dr. Denny, the physicians on duty at the Facility at the time of the incident; Lou Curtis, a nurse, also on duty the morning of Combs' death; Detective Greg Bell, the lead investigator from the Indiana State Police; and Daniel Row, another inmate on the G cellblock who gave a detailed interview about the events surrounding Combs' death.

*Id*. at 187-8. Additionally, the twelve-year delay resulted in three witnesses having "no recollection of the incident." *Id*. Our court found Barnett was prejudiced by the State's twelve-year delay in bringing charges against him:

There were apparently at least twenty inmates out of their cells and in the area when the incident occurred. Lack of key witnesses makes it more difficult for Barnett to support his claim of self-defense. Furthermore, in a shakedown of the areas after the incident, six knives were found. There is no evidence of who possessed those knives, no testimony from the person or persons who collected the knives, no DNA testing on the knives, and no medical testimony as to whether more than one knife was used in the stabbing or which knife caused the wound to the stomach which, according to the autopsy report, was the proximate cause of Combs' death.

*Id*. at 188.

[27] In finding prejudice, we stated, "[t]here is no explanation for why the prosecutor, now deceased, allowed a case to sit in his office for over a year and half without looking at it or why he returned it to the investigator instead of leaving it for his successor." *Id*. Based thereon, we held "Barnett was clearly prejudiced by the State's unexplained and unjustified delay – whether intentional or negligent – in bringing charges" and reversed Barnett's conviction. *Id*.

[28] *Barnett* is distinguishable from the case before us. Even assuming Higgason demonstrated actual and substantial prejudice[6] in the State's twenty-three-year delay in charging Higgason, the State was justified in the delay and did not engage in the delay to gain a tactical advantage. The State needed additional evidence to charge Higgason and that evidence could not be gathered at the time of the crime. First, the parties do not dispute that DNA testing capabilities in 1998 were not what they are today. Ten years after the crime, investigators were able to test the DNA under Tamez's fingernails and the results thereof indicated Higgason could not be excluded as a contributor. In 2020, after DNA testing had again become more refined, the DNA under Tamez's fingernails

---

[6] In *Ackerman*, our Indiana Supreme Court explicitly set forth two prongs – (1) actual and substantial prejudice stemming from the delay and (2) unjustifiable reason for delay such that the delay was used by the State to gain a tactical advantage – both of which must be satisfied for the trial court to grant a motion to dismiss for pre-trial delay in charging the defendant. *Ackerman*, 51 N.E.3d at 189-90. As we hold the State's twenty-three-year delay was justifiable and not used to gain a tactical advantage, we need not determine whether Higgason was prejudiced by the delay.

was tested and the results indicated Higgason was a contributor to the DNA found there. Thus, while the DNA samples under Tamez's fingernails were available in 1998, DNA testing in 1998 was not as advanced as it was in 2008 and 2020. The 2008 and 2020 DNA results were new evidence unavailable in 1998 and that evidence corroborated earlier statements regarding Higgason's involvement in the triple murder. Thus the State had a justifiable explanation for its delay and the delay did not occur to gain a tactical advantage.

## 2. Admission of Evidence

Higgason argues the trial court abused its discretion when it admitted the Digitized Recordings of the original Cassette Tapes containing Copley's telephone conversations with Higgason. Our standard of review regarding challenges to the admission of evidence at trial is well-settled:

> The general admission of evidence at trial is a matter we leave to the discretion of the trial court. We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.

*Crabtree v. State*, 152 N.E.3d 687, 696 (Ind. Ct. App. 2020) (internal quotation marks and citations omitted), *trans. denied*. Error in the admission of evidence is to be disregarded as harmless unless it affects the substantial rights of a party. *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008). In determining whether an evidentiary ruling has affected an appellant's substantial rights, we assess the

probable impact of the evidence on the jury. *Montgomery v. State*, 694 N.E.2d 1137, 1140 (Ind. 1998).

## 2.1 Foundation for Admission of Audio Tapes

[30] Higgason argues the trial court abused its discretion when it admitted the Digitized Recording of the Cassette Tapes, which contained Copley's two phone calls with a second party, because the State did not lay a proper foundation for the admission of the Digitized Recordings. Our review of the admission of audio recordings is well-settled. "The foundational requirements for admission of a tape recording made in a non-custodial setting are: 1) that the recording is authentic and correct, 2) that it does not contain evidence otherwise inadmissible, and 3) that it be of such clarity as to be intelligible and enlightening to the jury." *McCollum v. State*, 582 N.E.2d 804, 811-2 (Ind. 1991).

[31] Regarding the factors set forth in *McCollum*, Higgason contends the State "did not prove that the [Digitized Recording] played to jury was authentic and correct" because "the detective, who made the [Cassette Tape] recordings, could not recognize them when asked." (Br. of Appellant at 18.) Next, Higgason contends the Digitized Recordings contained statements from Copley that were inadmissible hearsay because they did not fall under the hearsay exception contained in Indiana Evidence Rule 801(d), which allows for the admission of a party-opponent. Further, Higgason asserts the State entered into evidence the Digitized Recording because the Cassette Tape "was of such limited clarity[.]" (*Id.*) Finally, Higgason argues the State further complicated matters and called into question the authenticity of the Digitized Recording

when it "presented to the jury a transcript the detective made from the original, not-introduced recording [Cassette Tape], and not a transcript made from the audio [Digitized Recording] published to the jury." (*Id*.)  Thus, Higgason argues, the Digitized Recording was inadmissible and the trial court abused its discretion when it admitted it into evidence.

[32]  We conclude the trial court did not abuse its discretion when it admitted the Digitized Recording into evidence because every factor of the *McCollum* test is satisfied.  First, regarding the authenticity of the tapes, Ricketts testified she listened to the Cassette Tapes when she digitized them and the digitization did not "change any of the words." (Tr. Vol. V at 110.)  Additionally, Copley's statements on the Cassette Tapes were not inadmissible hearsay because they provided context for what the State purported were Higgason's comments on the call. *See Hendricks v. State*, 162 N.E.3d 1123, 1135 (Ind. Ct. App. 2021) (in a recording of a call between the defendant and his co-conspirator, statements made by defendant's co-conspirator were admissible under the hearsay exception contained in Ind. Evid. R. 801(d) because they were not admitted for the truth of the matter asserted and instead to provide context for the defendant's statements on the call).  Finally, while the Cassette Tapes have certainly aged, the clarity of the Digitized Recording of those Cassette Tapes is sufficient because "[p]erfect quality is not required; rather, we require only that, taken as a whole, the recording must be of such clarity that it does not lead the jury to speculate about its contents." *Hall v. State*, 897 N.E.2d 979, 981 (Ind.

Ct. App. 2008). Thus, the trial court did not abuse its discretion when it admitted the Digitized Recording into evidence.

## 2.2 Best Evidence

[33] Higgason also argues the trial court abused its discretion when it entered the Digitized Recording of the calls between Copley and Higgason because the Cassette Tapes of the calls were available and thus the best evidence. The best evidence rule states: "An original writing, recording, or photograph is required in order to prove its content unless these rules or a statute provides otherwise." Indiana Rule of Evidence 1002.

> The purpose of [the best evidence] rule is to assure that the trier of the facts had submitted to it the evidence upon any issue that will best enable it to arrive at the truth . . . . [I]t excludes all testimony of the contents of such instruments when the instrument itself is available and could be examined by the jury.

*Pinkerton v. State*, 258 Ind. 610, 620-21, 283 N.E.2d 376, 382 (1972). Higgason claims the Cassette Tapes should have been admitted under the best evidence rule because they were true and accurate depictions of Copley's phone calls with Higgason and the State did not lay the proper foundation to prove the Digitized Recording was a direct copy of the Cassette Tapes.

[34] However, pursuant to Evidence Rule 1003, a "duplicate is admissible to the same extent as an original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Additionally, "the party opposing the admission of a duplicate

bears the burden of showing the existence of a genuine issue as to authenticity, and the challenge must be more than hypothetical." *Arlton v. Schraut*, 936 N.E.2d 831, 837 (Ind. Ct. App. 2010), *trans. denied*.

[35] At trial, Ricketts testified the contents of the Digitized Recording were the same as those on the Cassette Tapes. She noted the Cassette Tapes were digitized because "a lot of people don't have ways to play cassette tapes anymore" and the digitization can make the contents of the Cassette Tapes something "someone can actually use like now and from decade to decade." (Tr. Vol. V at 113.) In addition to Ricketts's testimony, Copley also testified the Digitized Recording accurately reflected the contents of his calls with a second party he testified was Higgason. Based thereon, we conclude the trial court did not abuse its discretion when it did not admit the Cassette Tapes pursuant to the best evidence rule because the Digitized Recording was properly admitted under Evidence Rule 1003. *See, e.g.*, *Hamilton v. State*, 182 N.E.3d 936, 938 (Ind. Ct. App. 2022) (trial court did not abuse its discretion when it admitted a cell phone recording of a surveillance video because the creator of the cell phone video testified the video was a true and accurate copy of the original surveillance video).

## 3. Mistrial

[36] Higgason argues the trial court abused its discretion when it denied his request for mistrial because the trial court's statement identifying Higgason as the second person on the calls with Copley placed him in grave peril of an unfair trial. A mistrial is an "extreme remedy that is warranted only when less severe

remedies will not satisfactorily correct the error." *Francis v. State*, 758 N.E.2d 528, 532 (Ind. 2001). "On appeal, the trial judge's discretion in determining whether to grant a mistrial is afforded great deference because the judge is in the best position to gauge the surrounding circumstances of an event and its impact on the jury." *McManus v. State*, 814 N.E.2d 253, 260 (Ind. 2004), *reh'g denied*.

[37] "When determining whether a mistrial is warranted, we consider whether the defendant was placed in a position of grave peril to which he should not have been subjected; the gravity of the peril is determined by the probable persuasive effect on the jury's decision." *James v. State*, 613 N.E.2d 15, 22 (Ind. 1993). A timely and accurate admonition is presumed to cure any error in the admission of evidence. *Owens v. State*, 937 N.E.2d 880, 895 (Ind. Ct. App. 2010), *reh'g denied*. Because of that presumption, reversible error will seldom be found if the trial court has admonished the jury to disregard a statement made during the proceedings. *Warren v. State*, 757 N.E.2d 995, 999 (Ind. 2001). When the trial court admonishes the jury, we also presume "the jury followed the trial court's admonishment and that the excluded testimony played no part in the jury's deliberation." *Francis*, 758 N.E.2d at 532.

[38] "Because the trial court evaluates first-hand the relevant facts and circumstances at issue and their impact on the jury, it is in the best position to evaluate whether a mistrial is warranted. We accordingly review the trial court's denial of a motion for mistrial for an abuse of discretion." *Weisheit v. State*, 26 N.E.3d 3, 15 (Ind. 2015) (internal citations omitted), *reh'g denied*, *cert. denied* 136 S. Ct. 901 (2016). The court abuses its discretion when its decision is

"clearly against the logic and effect of the facts and circumstances before the court." *Vaughn v. State*, 971 N.E.2d 63, 68 (Ind. 2012).

[39] During trial, because of the poor quality of the contents of the Digitized Recording, the trial court allowed the jury to view a transcript prepared by Detective Fielden from the Cassette Tapes of the phone calls between Copley and a second person Copley identified as Higgason. The transcript was not offered into evidence. When providing the jury with the transcript, the trial court stated, "you have a -- a transcript of the original telephone call between the -- these two, your witness and the defendant." (Tr. Vol. V at 202.) Higgason objected, arguing the trial court's statement positively identifying Higgason as the other person on the phone call with Copley was "inappropriate" and that determination was "within the province of the jury" and not the trial court. (*Id*. at 203.) In response, the trial court told the jury:

> So to -- to be clear -- and -- to be very very clear. Mr. Copley indicated that he made a phone call. He made a phone call at the request of Detective Fielden. This is the recorded phone call that the -- that the witness has indicated that he has reviewed and is about to play.
>
> Earlier I said between the -- the witness and the defendant. I did misspeak. I think the testimony thus far is it's a recorded phone call that was done by Mr. Copley.

(*Id*. at 204-5.)

[40]     The State then questioned Copley about the contents of the phone calls and

Copley identified Higgason as the second person on both phone calls.  Shortly

thereafter, Higgason moved for a mistrial.  He argued:

> [W]e believe a mistrial would be appropriate based upon the
> inference that the Court has concluded that the -- the statements
> are attributable to Mr. Higgason.
>
> And while I understand the Court gave a limiting instruction as
> to that, I think it's very difficult to unring that bell in front of this
> jury.
>
> Now they have it in their mind that the Court presiding over the
> trial believes that that is Mr. Higgason on that.  Whereas the only
> person who's ever identified him is Mr. Copley. . . . But now that
> the Court has sort of emphasized that this is between Mr. Copley
> and the defendant, the defense doesn't believe that Mr. Higgason
> can receive a fair trial at this point.  That that information can't
> be unrung.
>
> And so respectfully, Judge, we are moving for a mistrial based
> upon that statement to the jury.

(*Id*. at 218.)  The trial court denied Higgason's request for mistrial:

> All right.  I -- I will not grant a mistrial under -- under these
> circumstances.  You brought it to my attention I may have
> misspoke.  I informed the jury that I did misspeak.  And I
> informed the jury what the testimony was thus far correctly as
> testified by -- by Copley.  I asked them to disregard the comment
> I made about who was on the other side of the phone.  By giving
> them that admonishment, there's a presumption that they will
> follow the court instruction to them.  And that certainly given
> that admonishment is not a basis for a mistrial.

(*Id*. at 219.) After the denial, the court recessed for the day. The next day when court convened, Higgason renewed his request for mistrial on the same grounds as the day before. The trial court denied his request for mistrial.

[41] Higgason argues the trial court abused its discretion when it denied his motion for mistrial because he "was placed in grave peril when the trial court told the jury that Higgason was on the tape, an issue that was greatly disputed. The trial court took a highly contested issue out of the hands of the parties and informed the jury it was Higgason on the tape." (Br. of Appellant at 14.) Higgason asserts in doing so, the trial court, "a neutral arbiter[,]" improperly commented on the "veracity of disputed evidence." (*Id*.)

[42] We hold the trial court's inadvertent reference to the identity of the second party on Copley's phone calls did not place Higgason in grave peril of an unfair trial because (1) the comment was brief, (2) subsequent evidence supported the statement, and (3) the trial court gave proper admonishments to cure the error. To the first point, that is, the prejudicial nature of the short statement the trial court made regarding this issue, the State relies on *Szpyrka v. State*, 550 N.E.2d 316 (Ind. 1990). In *Szpyrka*, a police officer, who was a witness for the State, testified he "went to the Calumet City Police Department and picked up a photo of Thomas Szpyrka." *Id*. at 317-8. Szpyrka objected and asked for a mistrial, arguing the statement "improperly indicated to the jury that appellant had a criminal record." *Id*. at 318. The trial court admonished the jury to disregard the statement and denied Szpyrka's motion for mistrial. *Id*. In affirming the denial, our Indiana Supreme Court noted "it stretches the

credulity to believe that the jury could have been swayed to such an extent that except for the improper remark by the police officer appellant would have been acquitted." *Id*. The State contends the same is true here, and we agree. Higgason has not demonstrated that, but for trial court's passing comment regarding the identity of the other person on Copley's phone call, the jury would have reached a different verdict.

[43] Regarding the second point, that subsequent evidence supported the trial court's brief statement, Higgason did not request a mistrial until after the admission of the Digitized Recording and Copley's testimony in which he identified Higgason as the other party to the phone calls. Copley testified the other person on the phone call was "Jimmy" and he knew Higgason's voice because Copley had "known him for a while." (Tr. Vol. V at 205.) Copley identified the other person on the phone call as Higgason, the person in the courtroom at defense table. Thus, the State contends, there was evidence to suggest Higgason was the other party on the phone call, and we agree.

[44] Regarding the third point, the trial court provided an appropriate admonishment. The trial court stated to the jury that it misspoke and that the evidence before the jury at that time, before Copley's testimony, did not positively identify the other party to the call. Additionally, during jury instructions the trial court reminded the jury, "[n]othing the Court says or does is intended to recommend what facts or what verdict you should find" and "[i]t is your duty to determine the facts from the testimony and evidence admitted by the Court and given in your presence, and you should disregard any and all

information that you may derive from any other source." (App. Vol. II at 89, 116.) Based thereon, we conclude the trial court did not abuse its discretion when it denied Higgason's motion for mistrial. *See Weisheit*, 26 N.E.3d at 20 ("When the jury is properly instructed, we will presume they followed such instructions.") (quoting *Duncanson v. State*, 509 N.E.2d 182, 186 (Ind. 1987)), *and see Francis*, 758 N.E.2d at 532 (we presume the jury follows a trial court's admonishment).

## 4. Jury Question

[45]     Higgason argues the trial court erred when it did not notify counsel that the jury submitted two questions to the trial court after retiring for deliberations. Indiana Code section 34-36-1-6 provides:

> If, after the jury retires for deliberation:
>
>> (1) there is a disagreement among the jurors as to any part of the testimony, or
>>
>> (2) the jury desires to be informed as to any point of law arising in the case;
>
> the jury may request the officer to conduct them into court, where the information required shall be given in the presence of, or after notice to, the parties or the attorneys representing the parties.

Our Indiana Supreme Court has provided the proper procedure for trial courts to follow when a deliberating jury makes a request for additional guidance during its deliberations. In that situation, the trial court should

> notify the parties so they may be present in court and informed of the court's proposed response to the jury before the judge ever communicates with the jury. When this procedure is not followed, it is an ex parte communication and such communications between the judge and the jury without informing the defendant are forbidden. However, although an ex parte communication creates a presumption of error, such presumption is rebuttable and does not constitute per se grounds for reversal. When a trial judge responds to the jury's request by denying it, any inference of prejudice is rebutted and any error deemed harmless.

*Pendergrass v. State*, 702 N.E.2d 716, 719-20 (Ind. 1998) (citations and emphasis omitted).

[46] During deliberations, the jury sent two questions to the trial court. Higgason argues the jury's second question regarding whether they could return a guilty verdict as to murder "if we believe the defendant was present but did not inflict any blows on one or more of the counts being considered" was a request to be informed as to any point of law arising in the case and thus counsel should have been present in the courtroom for the trial court's answer to that question in open court. (Br. of Appellant at 23) (quoting Tr. Vol. VII at 136). Because he argues counsel was not notified of the question and the trial court did not follow proper procedure, Higgason asserts his convictions should be reversed.

[47]     As an initial matter, Higgason's argument is waived because he did not make an objection at trial. *See Halliburton v. State*, 1 N.E.3d 670, 678 (Ind. 2013) (failure to object to an issue at trial waives that issue from appellate review). In his reply brief,[7] Higgason acknowledges his argument is waived for failure to make a contemporaneous objection. Waiver notwithstanding, we hold any error in failing to follow the procedure set forth in Indiana Code section 34-36-1-6 is harmless.

[48]     Harmless error, by definition, is "an error that does not affect the substantial rights of a party." *Lander v. State*, 762 N.E.2d 1208, 1213 (Ind. 2002). Where an error is harmless, we may not grant relief or reverse on appeal. App. R. 66. In support of its argument that any error in the trial court's procedure regarding the jury's second question was harmless, the State cites *Stephenson v. State*, 742 N.E.2d 463 (Ind. 2001), in which our Indiana Supreme Court held the trial court's communication with the jury regarding the jury's request to review evidence for a second time was harmless because Stephenson did not demonstrate how that communication resulted in prejudice to Stephenson. *Id.* at 492.

---

[7] In his reply brief, Higgason argues the trial court committed fundamental error. He raised this argument for the first time in his reply brief and it is well-settled that a party on appeal waives any argument presented for the first time in its reply brief. *See Akin v. Simons*, 180 Ne.3d 366, 375 (Ind. Ct. App. 2021) (stating same). However, waiver notwithstanding, and as we conclude in this section, any error was harmless and thus cannot be fundamental error. *See Smith v. State*, 190 N.E.3d 462, 466 (Ind. Ct. App. 2022) ("harmless error cannot be considered fundamental"), *reh'g denied*, *trans. denied*.

Here, Higgason did not explain on appeal how he was prejudiced by the trial court's alleged error. Further, multiple witnesses put Higgason at the scene of the crime, Copley testified Higgason committed the murders with Copley, and the Digitized Recording included statements that suggest Higgason committed the murders. Thus, if the trial court did err in failing to notify counsel pursuant to Indiana Code section 34-36-1-6, the error was harmless because Higgason did not demonstrate he was prejudiced by the trial court's alleged error and there existed sufficient evidence to convict Higgason of the triple murder.

## Conclusion

We conclude the trial court did not abuse its discretion when it denied Higgason's motion to dismiss because the State's delay in prosecuting him for the murders was justified by the advances in science and not motivated by an attempt to prejudice Higgason. In addition, the trial court did not abuse its discretion when it admitted the Digitized Recording of the phone calls between Copley and Higgason. Further, the trial court did not abuse its discretion when it denied Higgason's motion for mistrial. Finally, any error in the trial court's decision to not notify counsel when the jury asked a question about Higgason's culpability was harmless because Higgason did not establish prejudice and there was sufficient evidence to convict Higgason of the murders of Tamez, T.R., and Hodge. Accordingly, we affirm Higgason's convictions.

Affirmed.

Foley, J., and Najam, Sr. J., concur.