

I N   T H E

# Court of Appeals of Indiana



FILED
Dec 31 2025, 10:25 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Andre D. Johnson,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

December 31, 2025

Court of Appeals Case No.
24A-CR-2903

Appeal from the Boone Circuit Court

The Honorable Lori N. Schein, Judge

Trial Court Cause No.
06C01-2109-F1-1739

---

**Opinion by Judge Vaidik**
Judges Tavitas and Felix concur.

**Vaidik, Judge.**

# Case Summary

[1] The State charged Andre D. Johnson with Level 1 felony dealing in a controlled substance resulting in death. A doctor had performed an autopsy on the decedent and determined that he died from a fentanyl overdose. The doctor moved to Mexico before trial, and on the State's motion, the trial court allowed him to testify remotely via videoconferencing. The jury found Johnson guilty, and he now appeals. He argues, among other things, that the doctor's remote testimony violated his right to face-to-face confrontation under Article 1, Section 13 of the Indiana Constitution. We agree, but given other evidence presented by the State, we find the error to be harmless beyond a reasonable doubt and affirm Johnson's conviction.

# Facts and Procedural History

[2] This case arose from the death of Wes Johnson, who does not appear to have been related to the defendant. Wes had a history of heroin addiction. In August or September of 2020, he completed a rehabilitation program and moved in with his parents in Thorntown.

[3] On the night of October 22, Wes texted Johnson, "You still doin the thing[?]" Ex. 38. Johnson responded, "Yes." *Id.* The next morning, they had the following text exchange, which Johnson concedes is evidence of a drug deal:

> Wes:  You up this early

| | |
|---|---|
| Johnson: | Wassup |
| Wes: | Not much man. Could I see you before work. I woke up late and going in late |
| Johnson: | How much |
| Wes: | 60 |
| Johnson: | Ok |

*Id.* The two continued texting to arrange a meeting in Indianapolis. They met shortly after 9:00 a.m., and then Wes drove back to his parents' house in Thorntown.

[4] Around 10:30 a.m. the next morning, Wes's sister found him dead on a bathroom floor at their parents' house. She called 911, and officers were dispatched to the house. On the bathroom sink, they saw a spoon, a syringe, and white powder that was later found to contain fentanyl. Wes's phone messages didn't indicate that he bought drugs from anyone other than Johnson around the time of his death. Wes's mother looked through the house and didn't find any other drugs or anything drug-related.

[5] Dr. Thomas Sozio, a forensic pathologist with Central Indiana Forensics Associates, conducted an autopsy. As part of the autopsy, Dr. Sozio sent a sample of Wes's blood to Axis Forensic Toxicology for testing. Axis returned a report stating that acetylfentanyl was "PRESENT" and that the sample was

"POSITIVE" for fentanyl in the amount of 19.3 ng/mL, with a "Reference Range" of 1-3 ng/mL. Ex. 28. Based on that report, Dr. Sozio concluded that Wes died from "Acetylfentanyl and fentanyl intoxication." Tr. Vol. 3 p. 63.

[6] The State charged Johnson with Level 1 felony dealing in a controlled substance resulting in death and with being a habitual offender.[1] A jury trial was scheduled to begin on September 9, 2024. Two months before trial, the State moved to allow Dr. Sozio to testify via videoconferencing. The State alleged, in relevant part:

> 7. In February of 2023, while preparing for trial in the State of Indiana v. Chad Grimball the State learned that Dr. Sozio had moved out of the country and now resides and works in Mexico.
>
> 8. The State did not have the ability to complete a trial deposition prior to Dr. Sozio moving to Mexico as the State did not know he was moving to Mexico.
>
> 9. The State has been in contact with Dr. Sozio via email regarding testifying at the upcoming trial.
>
> 10. Dr. Sozio still lives and works in Mexico.
>
> 11. Dr. Sozio is available and willing to testify via a live videoconferencing system such as Zoom or Microsoft teams.

---

[1] The State charged Johnson with a second count of Level 1 felony dealing in a controlled substance resulting in death based on the death of a second person in Boone County on the same day that Wes died. The jury found Johnson not guilty on the second count, and it isn't relevant to this appeal.

12. The State's subpoena power does not reach to Mexico and the State has no way to secure Dr. Sozio's presence in Lebanon, Indiana for trial.

13. Dr. Sozio is an essential witness in this case as he provides part of the chain of custody for the blood and toxicology results. Dr. Sozio authored the autopsy report based on the toxicology results that determined the deaths to be caused by an overdose.

14. Dr. Sozio has informed the State he would charge the State $10,000 plus airfare, hotel, and transportation to come back to Indiana for the trial. Even with that the State has no assurances given the lack of subpoena power.

15. The State also has concerns with not only the large sum of money requested but also with agreeing to pay a witness more then [sic] the original contracted rate to have him appear for trial because he now lives outside the jurisdiction.

16. The State believes the newly revised [Indiana] Administrative Rule 14 allows for live videoconferencing testimony of a witness if good cause is shown (brief attached).

17. The State believes this will not violate the Defendant's 6th Amendment Confrontation Clause Right under the United States Constitution or Article I, Section 13 of the Indiana Constitution as the jury and Defendant will be able to see Dr. Sozio just as if he were in the court room and a full cross examination can be conducted (brief attached).

Appellant's App. Vol. 2 pp. 48-49. The State didn't attach any exhibits to support its claims. Johnson objected to the State's motion, and the trial court held a hearing. Again, the State didn't present any evidence to support its

claims. Nonetheless, the court granted the State's motion, finding that it had "presented good cause" as required by Administrative Rule 14 and that Johnson's constitutional confrontation rights wouldn't be violated because he would "be able to see, hear, question and cross examine Dr. Sozio, via live video testimony, at trial." *Id.* at 56.

[7] The jury trial began as scheduled on September 9. Johnson renewed his objection to Dr. Sozio testifying remotely, which the trial court denied. Dr. Sozio testified via Microsoft Teams, stating his conclusion that Wes died from a fentanyl overdose. The parties could see him on a tablet, and the jurors could see him on two televisions.

[8] After Dr. Sozio testified, the State said that its next witness would be Stuart Kurtz, a forensic toxicologist with Axis. Upon learning that Kurtz hadn't personally tested Wes's blood, Johnson argued that admitting evidence of the testing through someone other than the person who performed the testing would violate his Sixth Amendment right of confrontation. In response, the State argued that the testing was done to determine the cause of death, not for the purpose of litigation, and that therefore the toxicology report was non-testimonial and would not implicate Johnson's confrontation rights. The trial court agreed with the State and allowed Kurtz to testify about the report. The court also admitted the report itself over Johnson's objection. Ex. 28. Kurtz testified, among other things, that the "comatose fatal range" for fentanyl is 3-20 ng/mL and that the report showing Wes's fentanyl level was 19.3 ng/mL

was "consistent with a fatality report from Fentanyl intoxication." Tr. Vol. 3 pp. 99, 110.

[9] The jury found Johnson guilty of dealing resulting in death, and he then admitted to being a habitual offender. The trial court sentenced him to 60 years in the Department of Correction.

[10] Johnson now appeals.

## Discussion and Decision

### I. Dr. Sozio's remote testimony violated Johnson's right to face-to-face confrontation under Article 1, Section 13 of the Indiana Constitution, but the error was harmless beyond a reasonable doubt

[11] Johnson first contends that the trial court violated his rights under the confrontation clauses of the federal and state constitutions by allowing Dr. Sozio to testify remotely. We generally review evidentiary rulings for an abuse of discretion, but claims of constitutional error are reviewed de novo. *Ramirez v. State*, 174 N.E.3d 181, 189 (Ind. 2021).

[12] The Sixth Amendment to the U.S. Constitution provides, in relevant part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Article 1, Section 13 of the Indiana Constitution provides, in relevant part, "In all criminal prosecutions, the accused shall have the right . . . to meet the witnesses face to face . . . ." Johnson contends that Dr. Sozio's remote testimony violated both provisions.

Because we conclude that Article 1, Section 13 was violated, we need not address Johnson's Sixth Amendment claim.

[13] The Indiana Constitution's confrontation right "has a special concreteness and is more detailed" than the federal right. *Brady v. State*, 575 N.E.2d 981, 987 (Ind. 1991). "A face-to-face meeting occurs when persons are positioned in the presence of one another so as to permit each to see and recognize the other." *Id.*

> Indiana's confrontation right contains both the right to cross-examination and the right to meet the witnesses face to face. It places a premium upon live testimony of the State's witnesses in the courtroom during trial, as well as upon the ability of the defendant and his counsel to fully and effectively probe and challenge those witnesses during trial before the trier of fact through cross-examination. The defendant's right to meet the witnesses face to face has not been subsumed by the right to cross-examination. That is to say, merely ensuring that a defendant's right to cross-examine the witness is scrupulously honored does not guarantee that the requirements of Indiana's Confrontation Clause are met. The Indiana Constitution recognizes that there is something unique and important in requiring the face-to-face meeting between the accused and the State's witnesses as they give their trial testimony. While the right to cross-examination may be the primary interest protected by the confrontation right in Article I, § 13 of the Indiana Constitution, the defendant's right to meet the witnesses face to face cannot simply be read out of our State's Constitution.

*Id.* at 988.

[14] A divided panel of this Court recently addressed whether testimony via videoconferencing satisfies the face-to-face requirement in *Shabazz v. State*, 255

N.E.3d 533 (Ind. Ct. App. 2025). Our Supreme Court later granted transfer and currently has the case under advisement, but the panel's discussion of the issue is instructive.

[15] The trial court in *Shabazz* allowed the State to present a DOC inmate via videoconferencing because he was housed in a facility four hours from the courthouse and the county jail had indicated that it "lacked the resources" to transport him. *Id.* at 541. On appeal, a majority of the panel held that this didn't violate Article 1, Section 13 because (1) the county jail's lack of resources constituted good cause, (2) Shabazz's attorney was able to cross-examine the inmate, (3) the inmate and the people in the courtroom could see each other, and (4) the inmate was not an eyewitness to the alleged crime and only provided cumulative testimony about one of Shabazz's multiple jailhouse admissions. *Id.* at 542.

[16] In a separate opinion, Judge Tavitas disagreed. She acknowledged that a criminal defendant's right to face-to-face confrontation "'must occasionally give way to considerations of public policy and the necessities of the case,'" *id.* at 552 (quoting *State v. Owings*, 622 N.E.2d 948, 951 (Ind. 1993)), but she concluded that a county's interest in conserving its limited resources didn't amount to an important public policy justifying remote testimony, *id.* at 552-53. Drawing a contrast, Judge Tavitas noted that Indiana's protected-person statutes (found in Indiana Code chapter 35-37-4), which aim to shield child witnesses and other vulnerable witnesses from the potential trauma of testifying in front of the people they are accusing, "involve a matter of important public

policy." *Id.* at 553 n. 9. Our Supreme Court has held as much. *See Brady*, 575 N.E.2d at 989 (holding that testimony via closed-circuit television under a protected-person statute is permissible under Article 1, Section 13).

[17]     Finally, Judge Tavitas emphasized the importance of in-person testimony in criminal trials:

> The ability to see a witness on a video screen is a poor substitute for in-person testimony. As noted above, the uniqueness of in-person testimony has been recognized by the United States Supreme Court and the Indiana Supreme Court. Not only is it more difficult to bear false witness when facing the accused in court, the jury (or the judge when acting as the trier of fact) can see the entire demeanor of the witnesses—such as facial expressions, nervous fidgeting, eye movement, and many other such subtle nuances that are much more easily noticed when viewing a witness in person. *See* Daniel M. Bialerk, Note, *Assessing Witness Demeanor in the Age of Covid-19 and Beyond*, 31 Cornell J.L. & Pub. Pol'y 451, 473 (2022) ("[I]n-person court sessions allow factfinders to more easily see nonverbal body gestures, which may facilitate communication in other ways."). This is much more difficult, if not impossible, to do on a video screen. In my opinion, "face to face" means exactly what it says. Screen-to-screen is not face-to-face.
>
> The mere inconvenience of securing the presence of a witness does not outweigh the defendant's right to confront the witnesses against him face-to-face. *See* Daniel Tran, Note, *Is Witness Credibility on Virtual Courtroom Procedures Impaired or Enhanced for Adults or Children?*, 32 S. Cal. Interdisc. L.J. 491, 512 (2023) (concluding that virtual courtroom proceedings are likely unconstitutional absent compelling interests because such virtual proceedings "impair witness credibility for adults," and

> concluding that mere efficiency and convenience are not
> compelling interests).

*Id.* at 553-54 (footnote omitted).

[18] We find Judge Tavitas's analysis to be more persuasive and adopt it here. Technology has done amazing things, but so far it hasn't been able to replicate the feeling of being in a room with someone. So the question then becomes whether the State identified an important public policy that justified Dr. Sozio testifying remotely. It did not. The State claimed only that Dr. Sozio (1) couldn't be subpoenaed while in Mexico, (2) was demanding more money than what he was entitled to under his contract, and (3) might not appear even if the State paid him the amount he was demanding. The State didn't present any evidence to support these claims, but even if it had, accommodating an available but uncooperative witness doesn't rise to the level of an important public policy. Therefore, the trial court violated Johnson's right to face-to-face confrontation by allowing Dr. Sozio to testify remotely.

[19] In arguing otherwise, the State relies, as it did in the trial court, on Interim Administrative Rule 14, which governs remote proceedings.[2] Subsection (C) of the interim rule provides, in part, "A court must conduct all testimonial proceedings in person except that a court may conduct the proceedings

---

[2] Our Supreme Court is currently considering a proposed final version of Rule 14. *See* https://www.in.gov/courts/publications/proposed-rules/april-2025/.

remotely for all or some of the case participants for good cause shown or by agreement of the parties." But the same subsection also states, "Remote proceedings must comply with constitutional and statutory guarantees." Because Dr. Sozio's remote testimony wasn't permissible under Article 1, Section 13 of the Indiana Constitution, it wasn't permissible under Rule 14(C).

[20] For these reasons, we conclude that the trial court erred by allowing Dr. Sozio to testify remotely. But not every constitutional error requires reversal. We will affirm if the error was harmless beyond a reasonable doubt. *Ramirez*, 174 N.E.3d at 192. Here, the key takeaway from Dr. Sozio's testimony—that Wes died of a fentanyl overdose—was independently established by the toxicology report and Kurtz's testimony about the report. Johnson doesn't dispute the significance of the toxicology evidence, but he renews his argument that this evidence was erroneously admitted in violation of his Sixth Amendment confrontation rights because the person who performed the testing wasn't called to testify. We disagree.

[21] Our Supreme Court rejected a similar argument in *Ackerman v. State*, 51 N.E.3d 171 (Ind. 2016). There, a child died while in Ackerman's care. A doctor conducted an autopsy the same day and issued a report stating that the child had injuries internally and to his head, neck, abdomen, and extremities, that the cause of death was multiple injuries, and that the manner of death was homicide. The coroner, however, listed the manner of death as undetermined, and no charges were filed at that time. When new evidence emerged decades later, Ackerman was charged with and tried for murder. By that time, the

autopsy doctor had died, but the trial court admitted his report into evidence and allowed another doctor to testify about the report. On appeal, Ackerman argued that this violated his Sixth Amendment confrontation rights. Our Supreme Court disagreed, concluding that the report wasn't "testimonial," and therefore didn't implicate the Sixth Amendment confrontation clause, because it wasn't created for the "primary purpose" of aiding a criminal investigation or prosecution. *Id.* at 186-89. While the report was eventually used for that purpose, the primary purpose for which the autopsy was conducted and the report was created was simply to determine the cause of the child's death. *Id.*

[22] Likewise, here, while the toxicology report was eventually used in a criminal prosecution, the primary purpose of the toxicology work was simply to determine the cause of Wes's death. The toxicology work was ordered by Dr. Sozio as part of the autopsy, not by police or prosecutors. Therefore, under *Ackerman*, the toxicology report wasn't testimonial, and the trial court didn't err by admitting the report and Kurtz's testimony about the report. And because that evidence independently established that Wes died from a fentanyl overdose, we agree with the State that the erroneous admission of Dr. Sozio's remote testimony was harmless beyond a reasonable doubt.[3]

---

[3] We acknowledge the tension between our holding above that Johnson had the right to confront Dr. Sozio in person about his autopsy of Wes and our Supreme Court's holding in *Ackerman* that an autopsy report can, at least sometimes, be admitted into evidence with no testimony at all from the autopsy doctor. Indeed, Johnson contends that *Ackerman* was wrongly decided. But that is an issue he will have to take up with our Supreme Court. In the alternative, Johnson asserts that *Ackerman* is no longer good law after the U.S.

## II. The State presented sufficient evidence to prove that Johnson dealt the fentanyl that caused Wes's death

[23]     Johnson also argues that even if the State presented sufficient admissible evidence to prove that Wes died from a fentanyl overdose, it failed to prove that Johnson dealt the fentanyl that caused the death. When reviewing sufficiency-of-the-evidence claims, we neither reweigh the evidence nor judge the credibility of witnesses. *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015). We will only consider the evidence supporting the conviction and any reasonable inferences that can be drawn from the evidence. *Id.* A conviction will be affirmed if there is substantial evidence of probative value to support each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*

[24]     Johnson doesn't dispute that the State presented sufficient evidence to prove he dealt drugs to Wes. Rather, he contends the State failed to prove that the drugs Wes bought from Johnson were the drugs that killed him. We disagree. The State presented evidence that Wes went home after buying drugs from Johnson

---

Supreme Court's decision in *Smith v. Arizona*, 602 U.S. 779 (2024), but he doesn't explain why, so that argument is waived.

We also note that Johnson didn't make any argument, either in his trial objection or in his brief on appeal, about Indiana's "notice-and-demand" statutes, found in Indiana Code chapter 35-36-11. Among other things, those statutes require the State to file pre-trial notice if it intends to introduce as evidence in a criminal trial a "laboratory report," which is defined as "a written report or affidavit relating to the results of a scientific test that is prepared for use at trial or to assist in a law enforcement investigation." Ind. Code §§ 35-36-11-1, -2; *see also Fischer v. State*, --- N.E.3d ---, No. 25A-CR-494 (Ind. Ct. App. Dec. 16, 2025). We see no indication in the record that the State filed such a notice in this case, but because Johnson hasn't made an argument under the statutes, we need not address them further.

and that he didn't have any messages about acquiring additional drugs. Also, Wes's mother looked through the house and didn't find any other drugs or anything drug-related. This evidence is sufficient to support a finding that the only drugs Wes had, and the drugs that killed him, were the drugs he bought from Johnson.

[25] Affirmed.

Tavitas, J., and Felix, J., concur.

ATTORNEY FOR APPELLANT

Riley L. Parr
Lebanon, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

George P. Sherman
Supervising Deputy Attorney General
Indianapolis, Indiana